# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL HESSLER Derivatively on Behalf of ADAPTHEALTH CORP.,<br><br>        Plaintiff,<br>v.<br><br> LUKE MCGEE, STEPHEN P. GRIGGS, GREGG HOLST, JASON CLEMENS, FRANK J. MULLENS, JOSHUA PARNES, RICHARD BARASCH, TERENCE CONNORS, SUSAN WEAVER, DALE WOLF, DAVID S. WILLIAMS III, BRADLEY COPPENS, TED LUNDBERG, and ALAN QUASHA,<br><br>        Individual Defendants,<br>-and-<br><br>ADAPTHEALTH CORP.,<br><br>        Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Carol Hessler ("Plaintiff"), by her attorneys, submits this Verified Stockholder Derivative Complaint for insider trading, violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal

Defendant AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp. ("AdaptHealth" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to AdaptHealth's reputation, goodwill, and standing in the business community and has exposed AdaptHealth to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged AdaptHealth in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by AdaptHealth's directors and officers from November 11, 2019 through the present (the "Relevant Period").

3.      AdaptHealth is a home medical equipment ("HME") business.

4.      This case involves Individual Defendants' failure to disclose AdaptHealth's declining growth. The Individual Defendants failed to disclose to investors that the Company's two main areas of growth, organic and mergers and acquisitions ("M&A") were unsustainable. The Individual Defendants also failed to disclose that the Company's then CEO was under criminal investigation for tax fraud during the relevant time period.

5.      AdaptHealth began trading publicly after its November 2019 merger with and into DFB Healthcare Acquisitions Corp. ("DFB"), a special purpose acquisition company ("SPAC").[1] DFB had sought to acquire a medical business that it though had the potential for exponential revenue growth. In this regard, DFB identified AdaptHealth as an appropriate acquisition target.

6.      On July 8, 2019, DFB filed a Form 8-K announcing that it had entered into an

---

[1] SPACs are "special purpose acquisition companies" that have become popular vehicles for various transactions, including transitioning a company from a private company to a publicly traded company. Unlike an operating company that becomes public through a traditional IPO, however, a SPAC is a shell company when it becomes public and it does not have an underlying operating business and does not have assets other than cash and limited investments.

agreement for a business combination with AdaptHealth Holdings, LLC (the "Business Combination").

7.      Under the leadership of Defendant Luke McGee ("McGee"), AdaptHealth had purportedly acquired almost 60 businesses in seven years and had increased revenue 200% in the three years preceding the DFB/AdaptHealth merger, which it accomplished through a combination of organic revenue growth and revenue from the companies AdaptHealth had acquired via mergers and acquisitions. During the Relevant Period, AdaptHealth reported strong growth in both metrics. Individual Defendants credited AdaptHealth's "experienced management" in general and Defendant McGee in particular for the Company's success.

8.      But AdaptHealth and McGee failed to disclose that Defendant McGee was involved in what authorities called the largest tax fraud in European history that cheated Denmark and other European countries out of billions of dollars in tax refunds (the "tax scheme"). Further, the Denmark authorities were closing in on Defendant McGee around the same time that he was merging AdaptHealth into DFB and selling investors on his ability to continue leading AdaptHealth's success. North Channel Bank, a bank in Germany that Defendant McGee co-owned in furtherance of the tax scheme, agreed to pay a criminal fine of 110 million Danish Kroner ("DKK"), or $16 million, in September 2019 for faking trades to secure tax reimbursements from the Denmark Treasury to which it was not entitled.

9.      Additionally, in May 2019, Defendant McGee agreed to a settlement with the Danish tax authorities to repay 1.55 billion DKK in proceeds that he and two of his co-conspirators had reaped from the tax scheme. Notably, the settlement did not provide immunity from criminal prosecution.

10.     On November 8, 2019, during after-market hours, DFB announced that the

Business Combination had closed and that the Company's stock would begin trading on November 11, 2019, under the new ticker symbol "AHCO."

11.     On November 19, 2019, Denmark filed suit against several pension funds that Defendant McGee personally created to carry out the tax scheme. The Danish action was a $120 million civil complaint with nearly $20 million tied to Defendant McGee for the roll that the funds played in the tax scheme, styled *Skatteforvaltningen v. Merkensteijn et al.*, Case No. 1:19-cv-10713 (S.D.N.Y. Nov. 19, 2019) (the "Denmark Complaint").

12.     With the pressure from Denmark's criminal investigation mounting on Defendant McGee, both components of AdaptHealth's growth strategy suffered. Organic growth had dried up by late 2020, as AdaptHealth struggled to integrate the large influx of new businesses that Defendant McGee was responsible for acquiring. AdaptHealth's management was struggling to integrate those businesses when the Board agreed to its largest acquisition yet, AeroCare Holdings, Inc. ("AeroCare"), in December 2020. AdaptHealth's acquisition of AeroCare was complete on February 1, 2021, just eight weeks before the Company put Defendant McGee on unpaid leave when they announced that Defendant McGee had been criminally charged by the Denmark authorities.

13.     The Company's public filings materially mislead investors about AdaptHealth's organic growth issues. The definition of the "organic revenue growth" metric that was disclosed to investors on the Company's quarterly earnings calls was changed. Individual Defendants replaced the "organic" revenue growth metric the Company had used since its inception, revenue growth tied to the Company's existing businesses that specifically excluded revenue growth attributable to recent acquisitions, to a new "pro forma" calculation that was inflated by incorporating revenue tied to AdaptHealth's recent acquisitions. Buried in a footnote in the

4

Company's Financial Supplement for 4Q 2020, the supplement stated: "[o]rganic growth as shown is defined as current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue" but did not disclose that this change was materially different from how the Company historically measured organic growth.

14.     Instead of the definition that AdaptHealth used historically, the Individual Defendants misleadingly characterized this new metric as "organic revenue" and reported revenue growth of 6% for 4Q 2020, over 11% for 1Q 2021, and told investors to expect organic revenue growth of 8-10% going forward.

15.     Before the truth began to emerge, regarding the tax scheme and the Company's true organic growth, certain Individual Defendants, as described below, sold shares of AdaptHealth stock, reaping approximately $38.5 million in total proceeds from insider sales based on material non-public information.

16.     The truth began to emerge on April 13, 2021, when AdaptHealth announced that it placed Defendant McGee "on unpaid leave from his roles as CoCEO and a Director of the Company" after claiming that it had "learned that authorities in Denmark have formally charged [him] with alleged tax fraud arising from certain past private activity."

17.     On this news, the Company's stock fell to $29.69 per share on April 13, 2021, a 19.7 % drop from the previous trading day's closing price of $36.99.

18.     While Defendant McGee's criminal tax fraud was now revealed to investors, actual circumstances surrounding s the Company's true organic growth metrics remained secreted.

19.     Then, three months later on July 19, 2021, *Jehoshaphat Research* ("Jehoshaphat") issued a report (the "Report") revealing that AdaptHealth's true organic revenue growth, when calculated in line with the Company's prior disclosures, was actually negative for the first six

months of 2021.

20.     Following the Report, the price of AdaptHealth's stock declined to $23.96 per share on July 19, 2021, approximately a 6% decline from the previous trading day's closing price of $25.47.

21.     On August 11, 2021, Jehoshaphat published an update to the Report (the "Update Report"), stating that "there is nothing more to debate" because of a disclosure by the Company. The Update Report revealed that the Company's SEC filings corroborated the Report.

22.     From November 11, 2019 through July 16, 2021, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's organic growth and Defendant McGee's criminal activity. Specifically, The Individual Defendants failed to disclose: (i) that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities; (ii) that Defendant McGee was named indirectly in the Denmark Complaint; (iii) that Defendant McGee remained under criminal investigation in Denmark; (iv) that the Company's organic growth metric had been replaced with a new formula; (v) how organic growth was being calculated, other than a vague footnote; (vi) that the Company's actual revenue growth, excluding revenue growth attributable to recent acquisitions, was declining; and (vii) as a result, the Company's disclosures regarding organic growth and Defendant McGee were materially false and misleading.

23.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting and due diligence into its "experienced" management team.

24.     As detailed herein, and as alleged in the ongoing federal securities class action in the Eastern District of Pennsylvania styled *Faille Jr. v. Adapthealth Corp. F/K/A Dfb Healthcare Acquisitions Corp. et al.,* Case No. 2:21-cv-03382, (the "Federal Securities Class Action"), AdaptHealth's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

27.     Venue is proper in this District because the Company's principal place of business is in this District, the Individual Defendants have been involved in business in this District, and Defendants' actions have had an effect in this District. Further, the Federal Securities Class Action is ongoing in this District.

## THE PARTIES

### Plaintiff

28.     Plaintiff Carol Hessler is and has continuously been a stockholder of AdaptHealth during the wrongdoing complained of herein.

### Nominal Defendant

29.     Defendant AdaptHealth is a Delaware corporation with its principal executive offices at 220 West Germantown Pike, Suite 250, Plymouth Meeting, PA. AdaptHealth's shares

trade on the NASDAQ under the ticker symbol "AHCO."

**Individual Defendants**

30.     Defendant McGee served as CEO of the Company and as a director since the closing of the Business Combination until February 2021 and served as Co-CEO from February 2021 until June 11, 2021. He is a named defendant in the Federal Securities Class Action.

31.     Defendant Stephen P. Griggs ("Griggs") served as co-CEO from February 2, 2021 until June 14, 2021 and has served as CEO since June 14, 2021. Griggs has served as a director since February 2, 2021. He is a named defendant in the Federal Securities Class Action.

32.     Defendant Gregg Holst ("Holst") served as the Company's CFO from 2014 until September 1, 2020.

33.     Defendant Jason Clemens ("Clemens") has served as the Company's CFO since August 3, 2020. He is a named defendant in the Federal Securities Class Action.

34.     Defendant Frank J. Mullens ("Mullens") has served as the Company's Chief Accounting Officer since September 21, 2020. On November 19, 2021, the Company announced that Mullens will be resigning effective May 16, 2022. He is a named defendant in the Federal Securities Class Action.

35.     Defendant Joshua Parnes ("Parnes") has served as a director and President of the Company since the closing of the Business Combination. He is a named defendant in the Federal Securities Class Action.

36.     Defendant Richard Barasch ("Barasch") has served as Chairman of the Board since the Company was founded in 2012. He served as the President and CEO of DFB from its formation until the closing of the Business Combination. During the fiscal year ended December 31, 2020, Barasch received $251,733 in total compensation from the Company. He is a named defendant in the Federal Securities Class Action.

37.     Defendant Terence Connors ("Connors") has served as a director of the Company since the closing of the Business Combination. During the fiscal year ended December 31, 2020, he received $200,866 in total compensation from the Company. According to a Form DEF 14A filed July 6, 2021 (the "July 2021 Proxy"), Connors serves as Chair of the Audit Committee. He is a named defendant in the Federal Securities Class Action.

38.     Defendant Susan Weaver ("Weaver") has served as a Company director since February 2018. During the fiscal year ended December 31, 2020, she received $175,866 in total compensation from the Company. She is a named defendant in the Federal Securities Class Action.

39.     Defendant Dale Wolf ("Wolf") has served as a Company director since the closing of the Business Combination. During the fiscal year ended December 31, 2020, he received $150,866 in total compensation from the Company. According to the July 2021 Proxy, Wolf serves as a member of the Audit Committee. He is a named defendant in the Federal Securities Class Action.

40.     Defendant David S. Williams III ("Williams") has served as a Company director since July 2020. During the fiscal year ended December 31, 2020, he received $125,866 in total compensation from the Company. He is a named defendant in the Federal Securities Class Action.

41.     Defendant Bradley Coppens ("Coppens") has served as a Company director since July 2020. During the fiscal year ended December 31, 2020, he received $125,866 in total compensation from the Company. According to the July 2021 Proxy, Coppens serves as a member of the Audit Committee. He is a named defendant in the Federal Securities Class Action.

42.     Defendant Ted Lundberg ("Lundberg") has served as a Company director since February 2021. According to the July 2021 Proxy, Lundberg serves as a member of the Audit Committee.

43.     Defendant Alan Quasha ("Quasha") served as a Company director from the closing of the Business Combination until September 1, 2021. Since the start of the Relevant Period, until he resigned, Defendant Quasha served on the Audit Committee. He is a named defendant in the Federal Securities Class Action.

44.     Collectively, Individual Defendants Wolf, Lundberg, Coppens, and Connors, are referred to herein as the "Audit Committee Defendants."

45.     Collectively, Individual Defendants McGee, Griggs, Holst, Clemens, Mullens, Parnes, Barasch, Connors, Weaver, Wolf, Williams, Coppens, Lundberg, and Quasha are referred to herein as the "Individual Defendants."

46.     The Individual Defendants, because of their positions with AdaptHealth, possessed the power and authority to control the contents of AdaptHealth's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

**Background**

47.     DFB was a SPAC before the business combination with AdaptHealth. SPACs are incorporated for the purpose of entering into a merger or similar business combination with one or more businesses or entities.

48.     AdaptHealth describes itself as a provider of full-service HME and supplies in the

U.S.

49.     On July 8, 2019, DFB announced in a Form 8-K that it had entered into the Business

Combination.

50.     The July 8, 2019 Form 8-K included a press release that stated the following, in

relevant part:

**Seasoned Management Team and Board**

**Adapt's management team is comprised of seasoned industry and financial professionals, led by Chief Executive Officer, Luke McGee, President, Josh Parnes, and Chief Financial Officer, Gregg Holst.**

Richard Barasch, who will be appointed Chairman of AdaptHealth upon closing of the transaction, was Chairman and CEO of Universal American, an NYSE-listed health insurance and healthcare services company until its sale to WellCare Health Plans in 2017.

'We believe that in order to be successful in the evolving HME marketplace, companies must possess scale and technological expertise without sacrificing service and product diversity,' said Mr. McGee. 'We expect to remain an active participant in the consolidation of our industry, while adhering to our core principles of providing tailored healthcare products and services that empower patients to live their best lives. We look forward to this next, exciting phase of our growth.'

'Healthcare is increasingly moving into the home and we believe Adapt occupies a unique place in the home-based healthcare value chain as the most efficient provider in the space,' said Mr. Barasch. 'We believe the Company's multiple touch points for patients with chronic conditions and its demonstrated ability to provide efficient solutions should become increasingly valuable as health care continues to migrate to the home. I am eager to work with Luke, Josh and their team as they continue their growth.'

(Emphasis added).

51.     The July 8, 2019 Form 8-K also included an investor presentation which stated the

following about Defendant McGee, in relevant part:

**Luke McGee**

*Chief Executive Officer*

- Chairman and CEO of AdaptHealth since 2012; built business from $7mm of revenue in first acquisition to nearly $500mm+ today
- Led the Company's proven acquisition track record and developing a scalable platform with robust integration systems that can accommodate future growth
- Prior to AdaptHealth, worked in the investment banking groups at Deutsche Bank and Merrill Lynch

52.     On August 19, 2019, DFB filed a Form PREM14A which stated, in relevant part:

Following the consummation of the Business Combination, the current management of AdaptHealth will become the management of DFB and Richard Barasch, our current Chief Executive Officer, will become Chairman of the Board. None of our current officers will be officers of DFB after the Closing.

***

None of the Company or the Company Subsidiaries have been charged with or received notice that it is under investigation with respect to a material violation of any applicable Law that remains unresolved as of the date hereof.

53.     On November 8, 2019, during after-market hours, DFB announced that the Business Combination had closed and that the Company's stock would begin trading on November 11, 2019 under the new ticker symbol "AHCO." Upon the closing of the Business Combination, DFB renamed itself "AdaptHealth Corp."

## The Individual Defendants' False and Misleading Statements

### November 11, 2019 Press Release by DFB

54.     On November 8, 2019, DFB announced that the Merger had closed. In a press release, Defendant Barasch stated:

On behalf of the team at DFB and Deerfield, I am thrilled to announce the closing of this transaction**…[Defendant McGee] and his team have built one of the industry's leading HME providers through a combination of accretive capital deployment, high-touch customer engagement, and a scalable, purpose-built, technology-enabled operating model.** We believe AdaptHealth will continue to occupy an increasingly distinct position in the home-based healthcare value chain as the most efficient provider in the space.

(Emphasis added).

55.     In the same press release, Defendant McGee stated that "We look forward to this next, exciting phase of our growth as a public company…We expect to remain an active participant in the consolidation of our industry while providing the highest level of patient care and service, with an over-arching commitment to creating value for all stakeholders."

***November 13, 2019 Form 8-K***

56.     On November 13, 2019, the Company filed a Form 8-K with an attached press release which included CEO commentary from Defendant McGee regarding revenue, Adjusted EBITDA, and organic growth":

**CEO Commentary**

Luke McGee, the Company's Chief Executive Officer, commented, 'We are very pleased with AdaptHealth Holdings' year-to-date 2019 financial results, which included significant increases in revenue and Adjusted EBITDA that demonstrate the successful execution of our strategy to grow organically and through accretive acquisitions.  The third quarter of 2019 represented the best quarter in our history in terms of Net revenues, Adjusted EBITDA and Adjusted EBITDA Less Patient Equipment Capex.'

'Our team has been heavily focused on acquisition integration and I am confident these efforts will be fruitful in Q4'19 and 2020.  We are affirming the Company's previously reported expectation that Adjusted EBITDA and Adjusted EBITDA Less Patient Equipment Capex for the twelve months ended December 31, 2019 will approximate $75 million and $123 million, respectively. Our potential acquisition pipeline is more robust than it has been at any point in the last three years, and we are truly excited about executing on these opportunities.'

***November 20, 2019 Form 8-K***

57.     On November 20, 2019, the Company filed a Form 8-K which included an investor presentation that explained that Defendant McGee's involvement in the Company was instrumental in its growth strategy:

# The 3rd Largest Provider of HME in the United States

+ Comprehensive portfolio of HME products for sale and rental

+ Addressing a growing $12 - $15bn segment within the broader $56bn HME industry

+ Serve 1mm patients and perform 7,000+ deliveries per day

+ Successful track record of growth, accretive capital deployment, and market-leading profitability

+ Best-in-class technology platform

+ Long-standing and diverse referral relationships and attractive payor mix

+ Proven, seasoned management team and Board of Directors

+ Projecting significant growth in net revenues and Adjusted EBITDA through 2020

| Ticker | AHCO; AHCOW |
| --- | --- |
| Headquarters | Plymouth Meeting, PA |
| Outstanding Shares | 72.4mm [3] |
| Market Cap (11/14) | $644mm |
| 9 Mo. '19 Net Revenue [1] | $380.1mm; up 60.7% |
| 9 Mo. '19 Adjusted EBITDA [1,2] | $89.4mm; up 52.1% |
| 9 Mo. '19 Adjusted EBITDA Less Patient Cap-Ex [1,2] | $53.8mm; up 74.4% |

**2020 FY Financial Targets**
(excluding acquisitions)

| Net Revenue | $582.7mm |
| --- | --- |
| Adjusted EBITDA [2] | $142mm |
| Adjusted EBITDA Less Patient Cap-Ex [2] | $88.1 mm |

adapthealth  /  Investor Presentation  /  November 2019

(1) Results are presented w/o giving effect to November 8, 2019 Business Combination; increases are compared to 2018 9 Mo. period
(2) Adj. EBITDA and Adj. EBITDA Less Patient Cap-Ex are Non-GAAP measures,  please see reconciliation tables later in this presentation
(3) Excludes warrants of 12.7mm shares with a strike price of $11.50

Page 3

\*\*\*

# Proven & Experienced Leadership

## AdaptHealth Leadership Team

**Luke McGee**
*Chief Executive Officer*

+ Chairman and CEO of AdaptHealth since 2012; built business from $7mm of revenue in first acquisition
+ Led the Company's proven acquisition track record and developing a scalable platform with robust integration systems that can accommodate future growth
+ Prior to AdaptHealth, worked in the investment banking groups at Deutsche Bank and Merrill Lynch

58.    The Individual Defendants caused the Company to conceal that its instrumental leader, Defendant McGee was implicated in "one of the greatest financial crimes" in Denmark's history.[2] While they were causing the Company to tout Defendant McGee's "proven and experienced leadership," the Individual Defendants also concealed that: (i) the bank Defendant McGee co-owned to conduct the tax scheme, North Channel Bank, had already been criminally

---

[2] David Segal, *Where in the World Is Denmark's $2 Billion?*, N.Y. Times (Oct. 5, 2018).

fined 110 million DKK, approximately $16 million, for its participation in a fraud against Denmark for unjustified payments of dividend tax of 1.1 billion DKK; (ii) Defendant McGee himself, along with others, had agreed to pay 1.55 billion DKK in proceeds from the tax scheme to the Danish tax authorities; and (iii) the Denmark Complaint filed on November 19, 2019 alleged "a fraudulent tax refund scheme that deceived SKAT into paying out over 12.7 billion [] DKK, the equivalent of approximately $2.1 billion [] of allegedly withheld tax."

*February 25, 2020 Form 8-K*

59.     On February 25, 2020, the Company filed a Form 8-K with an attached press release announcing the Company's fourth quarter and full year 2019 financial results. Defendant McGee attributed the results to acquisitions and strong organic growth:

> **CEO Commentary**
>
> Luke McGee, Chief Executive Officer of AdaptHealth, commented, 'we are very pleased with our 2019 performance, which we believe reflects our success in deploying a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, margin expansion, and cash generation. We reported a record 2019 across key financial metrics, closed on a near record number of acquisitions, and generated strong organic top line growth. In the fourth quarter of 2019, we generated record net revenues, Adjusted EBITDA, and Adjusted EBITDA less Patient Equipment Capex driven in large part by ordering patterns, particularly on Positive Airway Pressure (PAP) resupply that are typically highest in the fourth quarter.'

*February 25, 2020 Earnings Call*

60.     That same day, Defendants McGee and Holst participated in an earnings call. During the call, Defendant McGee touted the Company's positioning for organic growth:

> Strategically, closing the merger transaction with DFB Healthcare in November 2019, and entering the public markets was an important milestone. We are thrilled to have partnered with Deerfield Management and [Defendant] Barasch in that transaction and appreciate their continuing support and the support of all our new shareholders. We believe we've got the best business model in home medical equipment and are poised for exciting organic and acquisition-related growth over the next few years.

***

Our acquisition pipeline remains robust, and we expect to be active throughout 2020. We believe we can accretively acquire an additional $100 million HME revenue in 2020 in addition to already announced transactions. We will continue to look at opportunities to expand our product offering particularly for products that help patients with chronic diseases stay at home such as continuous glucose monitors, insulin pumps and other supply categories that were part of the PCS acquisition.

***March 6, 2020 10-K***

61.     On March 6, 2020, AdaptHealth filed a Form 10-K for the fiscal year ended

December 31, 2019 (the "2019 10-K"). Regarding the Company's business strategy, the 2019 10-

K stated, in relevant part:

AdaptHealth's strategy is to grow its revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of AdaptHealth's scalable, integrated technology platform.

**<u>Drive Market Share Gains in the HME Market</u>:**  AdaptHealth plans to leverage its technological and clinical advantages as well as its relationships with key constituents across the HME supply chain to deepen its presence in the HME market. AdaptHealth has built a strong network of highly diversified referral relationships that its sales force will continue to grow to help expand market penetration in certain geographies. Primary referral sources include acute care hospitals, sleep laboratories, pulmonologist offices, skilled nursing facilities and hospice operators, with no one source accounting for greater than 2% of its revenue as of December 31, 2019. AdaptHealth believes that maintaining and broadening these relationships will drive organic growth. AdaptHealth's ability to provide many products across its contracted payors is particularly valuable, especially to providers and facilities that discharge patients with a variety of product needs and insurance coverages. While some of its HME competitors focus on certain specific product lines, AdaptHealth is able to offer a wide array of products to its customers. AdaptHealth believes that its strong referral relationships and its broad product portfolio will help drive market share growth.

62.     Regarding the Company's sales and marketing activities, the 2019 10-K stated, in

relevant part:

Sales activities are generally carried out by AdaptHealth's full-time sales representatives with assistance from on-site liaisons in certain markets who interact directly with hospital discharge coordinators and patients. AdaptHealth's sales

team works closely with AdaptHealth's trained respiratory therapists in carrying out their daily sales activities. AdaptHealth primarily acquires new patients through referrals. Sources of referrals include acute care hospitals, sleep laboratories, pulmonologist offices, skilled nursing facilities and hospice operators, among others. AdaptHealth's sales representatives maintain continual contact with medical professionals across these facilities. AdaptHealth believes that its relationships with its referral sources are strong and that these entities will continue to be a source of organic growth through new patients. While AdaptHealth views its referral sources as fundamental to its business, no single referral source accounted for more than 2% of its revenues as of December 31, 2019.

63.    Regarding the Company's compliance with regulations, the 2019 10-K stated, in

relevant part:

AdaptHealth maintains a Compliance Program that meets the guidelines set forth by the Office of Inspector General of CMS, and provides ongoing compliance training designed to keep AdaptHealth's officers, directors and employees well-educated and up-to-date regarding developments on relevant topics and to emphasize AdaptHealth's policy of strict compliance. Federal and state laws require that AdaptHealth obtain facility and other regulatory licenses and that AdaptHealth enroll as a supplier with federal and state health programs.

64.    Regarding the Company's net revenue, the 2019 10-K stated, in relevant part:

Net revenue for the year ended December 31, 2019 was $529.6 million compared to $345.3 million for the year ended December 31, 2018, an increase of $184.4 million or 53.4%. **The increase in net revenue was driven primarily by acquisitions, which increased revenue by approximately $156.3 million. The remaining increase in net revenue was attributable to organic growth resulting from demographic growth in core markets and CPAP resupply sales and marketing initiatives.** For the year ended December 31, 2019, sales revenue (recognized at a point in time) comprised approximately 60% of total net revenue, compared to approximately 55% of total net revenue for the year ended December 31, 2018. The increase in sales revenue was driven primarily by the Verus and SleepMed acquisitions, which are predominantly CPAP resupply businesses and therefore have a high sales revenue mix, as well as strong organic growth in this category. For the year ended December 31, 2019, revenue from fixed monthly equipment reimbursements comprised approximately 40% of total net revenue, compared to approximately 45% of total net revenue for the year ended December 31, 2018.

(Emphasis added).

65.    The 2019 10-K was signed by Defendants McGee, Holst, Barasch, Parnes, Quasha,

Connors, Weaver, and Wolf.

17

66.     In support of the above 2019 10-K, Defendants McGee and Holst signed certifications pursuant to the Sarbanes-Oxley Act ("SOX Certifications"), appended to AdaptHealth's 2019 10-K. In these, Defendants McGee and Holst affirmed that:

> I have reviewed this Annual Report on Form 10-K of AdaptHealth Corp.;
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements and other financial information included in this report, fairly present, in all material respects, the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report[.]

67.     Defendants McGee and Holst also affirmed in the SOX Certifications that the 2019 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

68.     Regulation S-K, Item 401 requires directors and executive officers to disclose if they have been "convicted in a criminal proceeding or is a named subject of a pending criminal proceeding" in the past ten years if it is "material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant." 17 C.F.R. §229.401(f)(2).

69.     Defendants McGee, Holst, Barasch, Parnes, Quasha, Connors, Weaver, and Wolf violated Regulation S-K, Item 401 because they failed to disclose that Defendant McGee's bank had been criminally fined in Denmark, that the Denmark Complaint indirectly named him, and that he remained under investigation.

***May 5, 2020 1Q 2020 Results***

70.     On May 5, 2020, the Company filed a Form 8-K with an attached press release, announcing the 1Q 2020 financial results for the fiscal quarter ended March 31, 2020. The press release quoted Defendant McGee:

> Despite significant and sudden challenges brought on by the COVID-19 pandemic, our strong first quarter performance reflects the extraordinary hard work, resilience and dedication of our outstanding AdaptHealth team. Due in large measure to their efforts, we are continuing to successfully deploy a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, margin expansion, and cash generation. Our HME business performed well, and ahead of our internal budgets despite the historical softness of this three-month period during which patients are often managing through reset deductibles and insurance changes.

> We closed and fully integrated two significant and accretive HME business acquisitions during the quarter that are also expected to add an aggregate $91 million in net revenue in 2020. Advanced expands the Company's currently underpenetrated presence in the Southeast and Healthline strengthens our presence in Texas. I could not be more excited about these two scaled acquisitions.

> Our home medical supplies business, Patient Care Solutions (PCS), generated net revenue of $33.9 million for the quarter and negative EBITDA of $4.5 million. As previously disclosed, PCS is a turn-around situation and as part of our investment we expect $15 million in one-time restructuring and operational losses in 2020. We are pleased with our progress in addressing and curing various issues at PCS, and in the first quarter we exceeded our internal revenue and operational projections. We continue to believe PCS will be profitable in the fourth quarter of 2020. We are particularly excited about growth in the continuous glucose monitoring business at PCS and expect this will evolve into a growing and increasingly significant new product offering for AdaptHealth.

71.     On May 8, 2020, the Company filed a Form 10-Q for the fiscal quarter ended March 31, 2020 (the "1Q 2020 10-Q"), which stated, in relevant part:

> Net revenue for the three months ended March 31, 2020 was $191.4 million compared to $119.5 million for the three months ended March 31, 2019, an increase of $71.9 million or 60.2%. The increase in net revenue was driven primarily by acquisitions, which increased revenue by $57.9 million (including $33.9 million generated by PCS). **The remaining increase in net revenue was primarily attributable to organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets.** Net revenue, excluding PCS, was $157.5 million for the three months ended March 31, 2020. As a result of the coronavirus pandemic, during the three months ended March 31, 2020, the Company experienced reduced demand for products that are related to elective

medical services, such as CPAP new starts, orthotics, and certain other HME products, and this trend is expected to remain while the coronavirus crisis continues. However, the Company's CPAP resupply and other supplies business remains healthy, as most patients for that business are in their homes and can be easily contacted to refresh their supplies. Additionally, the coronavirus pandemic has led to an increased demand for respiratory equipment including ventilators and oxygen concentrators.

(Emphasis added).

72.     The 1Q 2020 10-Q contained the following legal proceedings disclosure:

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

In addition, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019, AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as requested. At this time, AdaptHealth Holdings cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further.

73.     The 1Q 2020 10-Q was signed by Defendants McGee and Holst. Additionally, Defendants McGee and Holst signed SOX Certifications representing, among other things, that the 1Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

20

74.     The 1Q 2020 10-Q failed to disclose that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities, that Defendant McGee was named indirectly in the Denmark Complaint, and remained under criminal investigation in Denmark.

***August 4, 2020 2Q 2020 Results***

75.     On August 4, 2020, the Company filed a Form 8-K with a press release, announcing the Company's 2Q 2020 financial results for the fiscal quarter ended June 30, 2020. The press release quoted Defendant McGee:

> Our strong year-to-date 2020 performance reflects the extraordinary hard work, resilience and dedication of our outstanding AdaptHealth team and their support of our patients and healthcare partners. We are continuing to successfully deploy a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, and cash generation. The COVID-19 pandemic has presented unique challenges, but we've been able to offset certain headwinds with new business opportunities and growth in other product categories. More specifically, PAP new starts, orthotics and other business lines closely linked to discretionary hospital and long-term care facility discharges were significantly down and our costs were higher in the second quarter of 2020. Offsetting these negative trends, new respiratory starts increased, and our teams successfully focused on our resupply businesses. Additionally, we were able to supply critical products needed to meet the emergency needs of non-traditional and new customers. We generated approximately $28 million of business-to-business (B2B) revenues in the quarter and opened new channels and customers which we expect to have future positive impacts. In the aggregate, the improvements in our resupply business and the B2B revenue growth more than offset the weakness in our traditional businesses. While volumes in several of the impacted products have begun to stabilize since the end of the second quarter of 2020, the Company does not expect volumes in those product categories to return to pre-pandemic levels in 2020.

76.     That same day, Defendants Holst, Parnes, and McGee participated in an earnings call. During the earnings call, Defendant McGee stated the following regarding the productivity of 2Q 2020:

> We had an extraordinarily busy and productive second quarter. Our core business performed well, and we were active in identifying attractive acquisition candidates to help further our strategic long-term goals. As previously announced, we closed

2 strategically important acquisitions on July 1, 2020: Solara Medical Supplies; and
ActivStyle Inc. Solara is a leading independent distributor of continuous glucose
monitors in the U.S. This is a transformative transaction that will establish
AdaptHealth as a leader in the fast-growing diabetes management business.

77.     During the earnings call, Defendant Holst and McGee had the following exchange

with a Mr. Blackman from Stifel, Nicolaus & Company, Incorporated:

**Mathew Justin Blackman**
Maybe, Gregg, just to start, what was organic growth in the quarter? And what's
roughly implied in the updated full year guidance for organic revenue growth?

**Gregg Holst; Chief Financial Officer**
Yes. Well, so for the quarter, organic growth was extraordinary because of the B2B
revenue, so it was in excess of 25%. If you exclude, B2B with the weakness and
some of the -- related to COVID, the organic growth was a couple of percent, 2%.
So -- and then for -- going forward, we've essentially projected the kind of the same,
a very steady amount of new businesses and kind of a lower level because of
COVID.

**Luke McGee**
And so Mat, just to add a little bit more context around that. I mean so even for the
first half, you're going to see organic growth year-over-year, well within the
guidance, that 6% to 8%, we've included, obviously, Q2, given COVID to have any
even positive organic growth. We're actually very proud of that B2B and then for
the rest of the year, again, if you look at where we are in July, and obviously, it's
just one month does not make a quarter, but we're seeing very nice sort of growth
in the respiratory categories in most of the bent metal, and the weakness really is
isolated to just PAP new starts and the orthotic business. So I think we're confident
that we can be back on that 6% to 8% in Q3.

78.     On August 7, 2020, the Company filed a Form 10-Q for the fiscal quarter ended

June 30, 2020 (the "2Q 2020 10-Q"), which stated in relevant part:

Net revenue for the three months ended June 30, 2020 was $232.1 million compared
to $124.1 million for the three months ended June 30, 2019, an increase of $108.0
million or 87.0%. The increase in net revenue was driven primarily by (i)
acquisitions, which increased net revenue by $77.0 million (including $33.0 million
generated by PCS), (ii) organic growth resulting from stronger CPAP resupply sales
and demographic growth in core markets, and (iii) net revenue of approximately
$28.4 million from referral partners and healthcare facilities in support of their
urgent needs for ventilation and oxygen equipment for COVID-19 patients. These
increases were partially offset by a decrease in net revenue from reduced demand
for certain products that are related to elective medical services which is attributable

to the coronavirus pandemic, such as CPAP new starts, orthotics, and certain other HME products, and this trend is expected to remain while the coronavirus crisis continues. However, the Company's CPAP resupply and other supplies business remains healthy, as most patients for that business are in their homes and can be easily contacted to refresh their supplies. Additionally, the coronavirus pandemic has led to an increased demand for respiratory equipment including ventilators and oxygen concentrators. Net revenue, excluding PCS, was $199.1 million for the three months ended June 30, 2020.

***

***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination. The loss of such key personnel could negatively impact our operations and financial results.***

79.    The 2Q 2020 also described the Company's legal proceedings:

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

In addition, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019, AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as requested. At this time, AdaptHealth Holdings cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further.

23

80.     The 2Q 2020 10-Q was signed by Defendants McGee and Clemens. Additionally, Defendants McGee and Clemens signed SOX Certifications representing, among other things, that the 2Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

81.     The 2Q 2020 10-Q failed to disclose that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities, that Defendant McGee was named indirectly in the Denmark Complaint, and remained under criminal investigation in Denmark.

***November 4, 2020 3Q 2020 Results***

82.     On November 4, 2020, the Company filed a Form 8-K with an attached press release announcing the Company's third quarter 2020 financial results. The press release quoted Defendant McGee:

> 'Our strong year-to-date financial performance and improved outlook for the remainder of 2020 reflects the tremendous efforts of our employees and their dedication to our patients and healthcare partners. We have remained opportunistic throughout the quarter, acquiring several diabetes management and home medical equipment businesses in high-growth areas. Additionally, on October 1, 2020, we acquired Pinnacle Medical Solutions, a leading distributor of medical devices and supplies to patients for the treatment of diabetes, including continuous glucose monitors and insulin pumps.'

> 'I am very proud of the dedication, courage, and professionalism of our employees as they continue to serve our patients and referral partners throughout this crisis, while also continuing to remain focused on delivering record financial results and establishing a strong foundation for 2021.'

83.     That same day, Defendants Clemens, Parnes, and McGee participated in an earnings call. During the earnings call, Defendant Clemens responded to a question regarding the Company's organic growth for the quarter:

> Organic growth for the third quarter was a little over 1 point. So in the face of COVID, I mean, we're actually pretty pleased with those results. As you heard in

our prepared remarks, starts, particularly around sleep, are coming back. As you know, there's a bit of a compounding effect on that. So as Q2 hit in the midst of COVID, and starts were down materially, there is a compounding effect of that, that we're in the middle of, that we're starting to see pull through going in a positive direction.

84.     Defendant McGee responded to a question regarding how the Company's organic

growth for the quarter compared to expectations:

I think we're pretty happy with -- in the quarter at 1%, still positive year-to-date in light of COVID. We knew Q3 and, frankly, the early part of Q4 is the hardest hit from the compounding of PAP rental revenues. And so to be able to deliver that, I'm incredibly proud of the team. I think we're setting up for a higher number in Q4 and as we go into 2021 back to our previously forecast range.

85.     Defendant McGee also highlighted the Company's growth:

We ended 2019 as a fast-growing and profitable home medical equipment company with a small medical supplies business. With acquisitions in 2020, we have not only accelerated the growth of our home medical equipment business but, importantly, have added a large and growing supplies business with a concentration in advanced diabetes supplies and management.

We continue to be active acquirers of traditional HME businesses in the third quarter. When we acquired the HME assets of Advanced Home Care and Healthline Medical in March, we noted that there would be merit to adding additional density in the Southeast and Southwest. To that end, we acquired Family Medical, a $40 million revenue HME in Eastern North Carolina in mid-August and closed on another acquisition in Texas in early October. These additions add important scale in high-growth geographies. We also made several smaller HME acquisitions in the Mid-Atlantic, Midwest and New England during the quarter. We are excited about the key operational leadership from these acquired companies and have retained many as leaders within AdaptHealth.

86.     On November 6, 2020, the Company filed a Form 10-Q for the fiscal quarter ended

September 30, 2020 (the "3Q 2020 10-Q"), which stated, in relevant part:

Net revenue for the three months ended September 30, 2020 was $284.4 million compared to $136.5 million for the three months ended September 30, 2019, an increase of $147.9 million or 108.4%. The increase in net revenue was driven primarily by (i) acquisitions, which increased net revenue by $146.2 million, (ii) organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets, and (iii) net revenue of approximately $4.3 million from referral partners and healthcare facilities in support of their urgent needs for

25

ventilation and oxygen equipment for COVID-19 patients. These increases were partially offset by a decrease in net revenue from reduced demand for certain products that are related to elective medical services which is attributable to the coronavirus pandemic, such as CPAP new starts, orthotics, and certain other HME products, and this trend is expected to remain while the coronavirus crisis continues. However, the Company's CPAP resupply and other supplies business remains healthy, as most patients for that business are in their homes and can be easily contacted to refresh their supplies. Additionally, the coronavirus pandemic has led to an increased demand for respiratory equipment including ventilators and oxygen concentrators.

*** 

***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination. The loss of such key personnel could negatively impact our operations and financial results.***

87.     The 3Q 2020 10-Q also described the Company's legal proceedings:

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

In addition, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019, AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as

requested. At this time, AdaptHealth Holdings cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further.

88.     The 3Q 2020 10-Q was signed by Defendants McGee and Clemens. Additionally, Defendants McGee and Clemens signed SOX Certifications representing, among other things, that the 3Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

89.     Similar to previous Form 10-Qs, the 3Q 2020 10-Q failed to disclose that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities, that Defendant McGee was named indirectly in the Denmark Complaint, and remained under criminal investigation in Denmark.

***Defendant McGee's December 7, 2020 Insider Sales***

90.     On December 7, 2020, Defendant McGee exchanged shares of Class B common stock pursuant to the terms of that certain Exchange Agreement, dated as of November 8, 2019 (the "Exchange Agreement"), for shares of Class A common stock.

91.     That same day, Defendant McGee sold Class A common stock at artificially inflated prices while in possession of adverse material non-public information about the tax scheme and the Company's true organic growth. The Company elected to make a cash delivery of $38,544,043 to Defendant McGee in lieu of 1,312,808 shares. Effectively the Company gave Defendant McGee cash while the shares were artificially inflated at $29.36 per share.

***January 5, 2021 Secondary Offering***

92.     On January 5, 2021, the Company held a secondary offering issuing over 7 million shares to the public at the price of $33 per share (the "Secondary Offering"). On December 18, 2020, the Company filed a Form S-3 (the "Registration Statement") and then on January 7, 2021, the Company filed a Form 424B5 (the "Prospectus"), which incorporated and formed part of the

Registration Statement. The Prospectus explained how experienced the management team was and highlighted the importance of management in general, the Company's success in acquisitions, and how the Company's purported success depends upon key personnel:

### Management

We are led by a proven management team with experience in the HME industry across a variety of healthcare organizations. We have a centralized approach for key business processes, including M&A activity, revenue cycle management, strategic purchases, payor contracting, finance, compliance, legal, human resources, IT and sales management. In addition, we have centralized many of the functions relating to our CPAP and other resupply businesses…

Following the closing of the AeroCare Acquisition, Stephen Griggs will join Luke McGee as co-Chief Executive Officer of AdaptHealth.

\*\*\*

**Proven M&A success**:   Our integrated technology platform includes scalable and centralized front-end and back office processes that facilitate the effective onboarding of potential acquisitions and help achieve cost synergies. We have demonstrated our ability to execute upon acquisitions, completing 86 transactions from our date of founding through December 31, 2020. As we continue to grow, we expect to deploy incrementally more capital and integrate substantially larger targets over time, which in turn we expect will be a source of continued growth for us.

**Experienced management team**:   We are led by a proven management team with significant experience in the HME and healthcare services industries. The team has domain knowledge within the industry having been employed at various healthcare organizations throughout their careers. Multiple members of the management team have also built independent HME companies and have the proven ability to scale a business within the HME industry. Additionally, several members of the management team have experience within their specific roles in both private and public company settings. Given the complexity of the highly regulated industry in which we operate, we believe that management's experience is a meaningful differentiator relative to our competitors.

\*\*\*

**Grow through acquisitions:**   The HME industry is highly fragmented, with more than 6,000 unique suppliers. We believe that ongoing reimbursement changes will continue the consolidation trend in the HME industry that has accelerated in recent years. We believe that, in the current environment, companies with the

ability to scale operations possess competitive advantages that can drive volume to their platforms. As one of a limited number of national HME companies, we plan to continue to evaluate acquisitions and execute upon attractive opportunities to help drive growth.

***

***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination. The loss of such key personnel could negatively impact our operations and financial results.***

Our ability to successfully operate our business is dependent upon the efforts of certain key personnel of AdaptHealth. It is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability. Furthermore, certain of the key personnel of AdaptHealth may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements.

93.     Similar to previous filings, the Prospectus failed to disclose that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities, that Defendant McGee was named indirectly in the Denmark Complaint, and remained under criminal investigation in Denmark.

**March 4, 2021 Q4 2020 and Full Year 2020 Results**

94.     On March 4, 2021, the Company filed a Form 8-K with an attached press release announcing the Company's fourth quarter and full year 2020 financial results. The attached press release quoted Defendant McGee:

'We are very pleased with our 2020 performance, which we believe is a testament to our relentless focus on our patients and referral sources and our ability to drive growth through process improvements and technology solutions. In the fourth quarter, our diabetes business drove substantial growth as the result of high ordering patterns in December and our continued investment in accretive acquisitions. We are increasing guidance for 2021 as a result of these acquisitions as well as from our prospects for organic growth in 2021. We are benefiting not only from the underlying growth in the diabetes business in general, but also from our investments in our other chronic disease businesses such as obstructive sleep apnea. The

enhanced scale of the combined AdaptHealth and AeroCare (serving nearly 3 million patients annually) positions us as a national leader in helping patients manage chronic diseases.'

95.     That same day, the Company held an earnings call to discuss the fourth quarter and full year 2020 results. Defendants Clemens, Parnes, McGee, and Griggs participated in the call. During the earnings call, Defendant McGee spoke about the Company's growth:

We continue to grow our business with accretive acquisitions through the year, including the transformational acquisition of AeroCare that closed on February 1, 2021. In total, we acquired 22 companies in 2020.

As we've demonstrated over the past several years, our team has the ability to integrate acquisitions into a cohesive and comprehensive platform to deliver health care in the home. The acquisition of AeroCare will only enhance and accelerate our goals here. Our management teams have shared a common view of success for a long time, a business that is powered by technology, connectivity and ease of doing business with our referring providers, efficient logistics and turnaround times, and patient satisfaction with our products and services. We continue to invest in these important areas, and the team will talk about progress in our prepared remarks.

Following the AeroCare closing, we remain focused on strengthening our geographic footprint, product mix and patient access through strategic and accretive acquisitions. In late February, we closed on the acquisition of Allina Health Home Oxygen & Medical Equipment in Minneapolis. And earlier this week, we closed on 2 other acquisitions, further complementing our existing HME businesses in the Midwest and Southern California.

96.     Also, during the earnings call, Defendant McGee stated that "we will continue to find ways to drive organic growth. We will learn from AeroCare best practices and also seek to capitalize on growth opportunities as life returns to a more normal cadence throughout the course of 2021."

97.     During the earnings call, Defendant Clemens stated, in relevant part:

To emphasize all of the trends above and as detailed on the slide in our Q4 2020 earnings supplement, our organic growth for full year 2020 was 8.6% when including the COVID B2B business and 5.6% when excluding B2B. For the fourth quarter, organic growth was 5.7% when compared to the fourth quarter of 2019, including the COVID B2B business and 4.9% when excluding B2B.

With our PAP census rebuilding after the depressed new starts in midyear, increase in oxygen business in Q4, continued market expansion in CGM, we remain confident in our organic growth prospects between 8% and 10% for 2021.

98.     In response to the a question regarding the Company's revenue, Defendant Clemens

stated:

So on the revenue side, I mean you've got that right. I mean we increased the organic growth in the revenue guide when we came out with the Aero announcement in late 2020. So no real change there, just kind of confirming evidence that we feel rock-solid about our organic growth.

99.     The earnings call also included a presentation with the following slide related to

"organic revenue growth:"



**March 16, 2021 10-K**

100.     On March 16, 2021, the Company filed a Form 10-K for the fiscal year ended

December 31, 2020 (the "2020 10-K"), which stated, in relevant part:

Net revenue for the year ended December 31, 2020 was $1.06 billion compared to $529.6 million for the year ended December 31, 2019, an increase of $526.7 million or 99.5%. The increase in net revenue was driven primarily by (i) acquisitions completed during 2020, which contributed net revenue of $450.2 million during the year, (ii) organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets, and (iii) net revenue of $36.5 million from referral partners and healthcare facilities in support of their urgent needs for ventilation and oxygen equipment for COVID-19 patients. These increases were partially offset by reduced demand for certain products that are related to elective medical services which is attributable to the coronavirus pandemic, such as CPAP new starts, orthotics, and certain other HME products, and this trend is expected to remain while the coronavirus crisis continues. However, the Company's CPAP resupply and other supplies business remains healthy, as most patients for that business are in their homes and can be easily contacted to refresh their supplies. Additionally, the coronavirus pandemic has led to an increased demand for respiratory equipment including ventilators and oxygen concentrators.

***

***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including senior management. The loss of such key personnel could negatively impact our operations and financial results.***

101.    The 2020 10-K also described legal proceedings:

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve patient complaints, personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

For example, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that

account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019 AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as requested. On November 9, 2020, the EDPA indicated to the Company that the investigation remained ongoing. The EDPA also requested additional information regarding certain patient services and claims refunds processed by AdaptHealth in 2017. The Company is compiling this information in coordination with the EDPA. While AdaptHealth cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on the Company.

Additionally, in March 2019, prior to its acquisition by AdaptHealth, AeroCare was served with a civil investigative demand ("CID") issued by the United States Attorney for the Western District of Kentucky ("WDKY").

The CID seeks to investigate allegations that AeroCare improperly billed, or caused others to improperly bill, for oxygen tank contents that were not delivered to beneficiaries. The WDKY has requested documents related to such oxygen tank content billing as well as other categories of information. AeroCare has cooperated with the WDKY and has produced documents and provided explanations of its billing practices. In September 2020, the WDKY indicated the investigation includes alleged violations of the federal False Claims Act and as well as alleged violations of state Medicaid false claims acts in ten states. AeroCare has cooperated fully with the investigation and has indicated to the WDKY that concerns raised do not accurately identify Medicare coverage criteria and that state Medicaid coverage requirements generally do not provide for separate reimbursement for portable gaseous oxygen contents in the circumstances at issue. While AdaptHealth cannot provide any assurance as to whether the WDKY will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on AdaptHealth.

102.    The 2020 10-K was signed by Defendants McGee, Griggs, Clemens, Barasch, Parnes, Quasha, Connors, Weaver, Wolf, Coppens, Williams, and Lundberg. Additionally, Defendants McGee, Griggs, and Clemens signed SOX Certifications representing, among other things, that the 2020 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Company."

103.    The Individual Defendants failed to disclose that: (i) the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities; (ii) Defendant

McGee was named indirectly in the Denmark Complaint; and (iii) Defendant McGee remained under criminal investigation in Denmark.

***Defendant Weaver's March 17, 2021 Insider Sales***

104.    Before the truth began to emerge, Defendant Weaver sold 1,050 shares of Class A common stock at the artificially inflated price of $38.04 while in possession of adverse material non-public information regarding the tax scheme and the Company's true organic growth, reaping approximately $39,942 in proceeds.

**The Truth Begins to Emerge**

***April 13, 2021 Form 8-K***

105.    On April 13, 2021, the Company filed a Form 8-K with an attached press release regarding then Co-CEO Defendant McGee which stated:

> *AdaptHealth Corp. has learned that authorities in Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity. The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business.*
>
> *AdaptHealth has placed Mr. McGee on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending.*
>
> *The Board of Directors of AdaptHealth takes this matter very seriously and is monitoring the situation closely in consultation with its legal advisors. The Board has full confidence in the Company's management team, led by current Co-CEO Steve Griggs and President Josh Parnes, and in its ability to ensure that AdaptHealth's business remains strong and to maintain the Company's growth trajectory.*

106.    On this news, the Company's stock fell to $29.69 per share, a 19.7 % drop from the previous trading day's closing price of $36.99.

107.    Although the truth regarding Defendant McGee's criminal tax fraud against Denmark had been revealed, the Company still did not disclose the truth regarding its organic growth metrics.

*May 6, 2021 1Q 2021 Earnings Call*

108.    On May 6, 2021, Defendants Clemens, Parnes, and Griggs participated in an earnings call. During the earnings call, Defendant Griggs stated, in relevant part:

Before we get to the numbers, I'd like to discuss some of the highlights of the quarter. Despite the ongoing effects of the pandemic on certain product lines, we're very pleased with our organic growth rate of 11.5%. With the recent return of referral volumes in our sleep and hospital discharge business to pre-pandemic levels and current organic growth in diabetes and resupply, we feel confident that the balance of 2021 will meet our organic growth expectations.

109.    During the earnings call, Defendant Clemens stated, in relevant part:

For the first quarter ending March 2021, AdaptHealth reported net revenue of $482.1 million, an increase of 152% from the first quarter of 2020. The substantial increase is a result of our company-wide focus, driving organic growth and the efficient integration of our 2020 and 2021 acquisitions, including the acquisition of AeroCare, which was completed on February 1, 2021. As a frame of reference, pro forma revenue for acquisitions was $564.1 million for the first quarter, driven primarily by AeroCare, but also from solid performance from previously announced                                                                                                          acquisitions.

As detailed in our Q1 2021 earnings supplement, our organic growth for the quarter was very strong at 11.5%, up significantly against Q4 2020 organic growth and led by new starts in our diabetes product line. There's additional good news on the revenue front as we learned of several regulatory changes during the quarter that will provide additional tailwind to our business in 2021. Medicare sequestration relief was extended through the balance of the year. Additionally, the public health emergency was extended through mid-July, positively impacting the nonrural non-CBA DME fee schedule.

110.    The earnings call also included a presentation with the following slide related to "year-on-year revenue growth:"



**May 10, 2021 10-Q**

    111.    On May 10, 2021, the Company filed a Form 10-Q for the fiscal quarter ended

March 31, 2021 (the "1Q 2021 10-Q"), which stated, in relevant part:

> Net revenue for the three months ended March 31, 2021 was $482.1 million compared to $191.4 million for the three months ended March 31, 2020, an increase of $290.7 million or 151.8%. The increase in net revenue was driven primarily by (i) acquisitions completed during the three months ended March 31, 2021, which contributed net revenue of $142.6 million during the period, (ii) net revenue contributed by acquisitions completed after March 2020 and prior to the beginning of the current reporting period, and (iii) **organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets**. The increase is also partially due to the impact in the 2020 period of reduced demand for certain products that are related to elective medical services which was attributable to the coronavirus pandemic, such as CPAP new starts, orthotics, and certain other HME products. The Company's CPAP resupply and other supplies business remains healthy, as most patients for that business are in their homes and can be easily contacted to refresh their supplies. Additionally, the coronavirus pandemic has led to an increased demand for respiratory equipment including ventilators and oxygen concentrators.

(Emphasis added).

112.    The 1Q 2021 10-Q was signed by Defendants Griggs and Clemens. Additionally, Defendants Griggs and Clemens signed SOX Certifications representing, among other things, that the 1Q 2021 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

113.    The Individual Defendants failed to disclose: (i) that the Company's organic growth metric had been replaced with a new formula; (ii) other than a vague footnote, how organic growth was being calculated; and that (iii) the Company's actual revenue growth, excluding revenue growth attributable to recent acquisitions, was declining; and (iv) as a result, the Company's disclosures regarding organic growth were materially false and misleading.

**The Truth Continues to Emerge**

*July 19, 2021 Report*

114.    On July 19, 2021, during pre-market hours, Jehoshaphat published the Report alleging that AdaptHealth is a "roll-up" company, or a company that is built primarily through the acquisition of smaller companies with common services or products, that obscures its organic growth. When the Company keeps acquiring smaller companies, it keeps "[r]etroactively changing past organic growth numbers to be higher, with no disclosure about the change."

115.    Specifically, the Report stated that "[w]hile management claims (and consensus estimates reflect) an organic growth trajectory of 8-10%, AHCO is in fact experiencing double digit organic decline. It is also, in our opinion, taking steps to obscure that decline which are expressly forbidden by the SEC." Indeed, the report suggested that the Company's misstatements regarding its organic growth trajectory was "a blatant violation of non-GAAP disclosure rules, for which companies get into huge trouble."

116.    Specifically, the Report explained how organic growth was declining:

- Over the past five and a half years, actual organic growth has averaged not 8-10%, but rather ~0%. Recently, it's cratered to double-digit negative.

- AHCO claims on its earnings calls that it had 6% organic growth in FY20 and that this accelerated to 12% in Q121. The Street accepts this characterization fully, and projects 8%+ organic growth going forward. But nowhere does management provide investors with numeric inputs for these numbers.

- In Q420 alone, organic revenues declined by more than -$20m year-over-year.

- AHCO recently took highly unusual steps to make it harder for investors to see organic growth. Some of these include:

   o Failing to disclose contributions from all acquisitions on a quarterly basis (even meaningful ones)

   o Offering its own organic growth "estimate" with no quantitative inputs available and confusing wording

   o Changing organic growth calculations without disclosure

   o Retroactively changing the organic number without disclosing such change

   o Removing certain inorganic contribution disclosures from one SEC filing to the next, etc.

**We believe that some of these actions are prohibited by the SEC's rules on non-GAAP disclosures.**

- We don't think it's a coincidence that management decided to take its organic growth disclosure from "translucent" to "totally opaque" in 2H20: this was just as true organic growth was going from negative to very negative. This was also when they decided to do their biggest deal ever, and to set up the company for an exit of the CEO.

117.   The Report further explained the inconsistencies of the Company's reported organic growth:

**Apparently in Q420, AHCO's management discovered that time travel can be lucrative (perhaps they watched Timecopxvi?), so they went back and changed history:**

- Q1 organic growth went from 8% to 9.9%

- Q2 went from 2% to 5.5%

- Q3 went from 1% to 3.2%

Q2 and Q3 transcripts both mentioned the number being ex-B2B. Q1 did not mention this distinction, as B2B, or emergency sales of respiratory equipment during the hospital crisis, was not a major factor yet.

(According to one former employee, "Luke knew what he was doing. He was going to push this to the limits of the envelope." Changing historical growth numbers fits the characterization painted by formers.)

Doubling or tripling your historical organic growth rate by waving a wand is nice work if you can get it. We were unable to find any disclosure to investors of the fact that these organic growth measurement numbers had been changed. **Management still has never quantified the inputs for either the old or the new numbers.** (The only change has been the addition of this "Consistent Strength in Year-on-Year Revenue Growth," which by the way is an insanely ironic title.)

**To our knowledge this is a blatant violation of non-GAAP disclosure rules, for which companies get into huge trouble.** Longtime followers of US stock frauds will remember MDC Partners (ticker MDCA), a company whose CEO was eventually banned for five years from serving as an officer or director of a public company, and which cost its shareholders over 90% of their investment in a relatively short period of time as the rollup's fraud unraveled. In 2017 the SEC brought charges against MDCA, in part for violating rules that sound pretty relevant here[.]

118.    The Report also included interviews with former employees that corroborated

Jehoshaphat's allegations:

- Our key findings above were consistent with what former employees told us in interviews. Former executives described a chaotic, understaffed business, failing to do substantial M&A diligence in a race to accumulate assets.

- One interviewee said that the company's M&A department was "like a barn fire. There were two acquisitions happening a month. They didn't have the ability to disaggregate [organic growth], trust me. They had no f****ng clue. There was no concept of what organic growth actually was." He described the overall company as a "house of cards."

- One common refrain was disbelief at the idea that this business grows meaningfully faster than GDP.

119.    Following the Report, the price of AdaptHealth's stock declined to $23.96 per share

on July 19, 2021, approximately a 6% decline from the previous trading day's closing price of $25.47.

***August 11, 2021 Updated Jehoshaphat Report***

120.    On August 11, 2021, Jehoshaphat published an update to the Report (the "Update Report"), which stated that "there is nothing more to debate" because of a disclosure by the Company.

121.    The Update Report stated, in relevant part:

**There is now nothing more to debate – organic growth in both Q1 and Q2 2021 was indeed negative, more than 1,000 basis points below management's claims. A new SEC filing disclosure confirms it**.

This disclosure is brand new, provided for the first time just this past Friday afternoon. In its Q221 10-Q, AHCO chose (was forced?) to disclose its full inorganic contribution to its quarterly results in its 10-Q for the three months ended June 30, 2021.

**The just-released 10-Q shows an ex-B2B organic decline of -4% for the six months ended 6/30/21**:

'Excluding this revenue, net revenue was $1,089.2 million and $394.0 million for the six months ended June 30, 2021 and 2020, respectively, an increase of $695.2 million. The increase in net revenue was driven primarily by acquisitions completed after January 1, 2020, which increased net revenue by $711.2 million…'

AHCO quietly uploaded its 10-Q to the SEC website just before 5:30pm this past Friday. Prior to uploading it, AHCO asserted to investors in its earnings release and associated conference call that its organic growth rate was 10%. Analysts published notes celebrating this "fact," and continue to forecast 8-10% organic growth going forward. The following Monday the company hosted a non-deal roadshow to market its stock and announced the hiring of a new investor relations professional. 10-Qs can get lost in the shuffle under normal conditions, but AHCO seems to have put in some elbow grease to make sure this one did.

On earnings day last week, AHCO stock surged 16% and squeezed out many shorts when management got on its call and proclaimed these silly growth rates. The analyst community breathed a sigh of relief in print, albeit premature. What incredibly awkward timing, then, for the company to quietly release a 10-Q the next day that comprehensively and concisely proves that organic growth is negative after all.

\*\*\*

**<u>Management Talked Loudly About "10% Organic Growth" on the Q2 Call and Press Release…</u>**

\*\*\*

Management also claimed, ridiculously, that they had voluntarily improved their organic growth disclosure in Q121, prior to our report being published. While this is technically true – they did add a nuance of disclosure by quantifying all, instead of just some, current-period deals – it is laughable when viewed in context, because the disclosure added in Q121 did not quantify all contributions and is therefore useless as a barometer of Q121 organic growth. (This is like you asking how tall someone is and getting the answer, "more than three feet.")

Sell-side analysts were placated by the happy talk. Organic growth percentage estimates have not budged, and the stock went up 16%. However, just one day later…

**<u>…Management Quietly "Admitted" in an SEC Filing That True Organic Growth Was Negative in At Least the Last Two Quarters (Validating Our Methodology for Earlier Quarters as Well)</u>**

122.    The Update Report specifically pointed out the changes made by management in

the subtle Form 10-Q filed August 6, 2021 for the fiscal quarter ended June 30, 2021:

Following are two screenshots:

The first is from the Q121 10-Q (before our report):

'[C]ompared to $191.4 million for the three months ended March 31, 2020, an increase of $290.7 million or 151.8%. The increase in net revenue was driven primarily by (i) acquisitions completed during the three months ended March 31, 2021, which contributed net revenue of $142.6 million during the period, (ii) <u>net revenue contributed by acquisitions completed after March 2020 and prior to the beginning of the current reporting period</u>, and (iii) organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets…'

The second is from the Q221 10-Q (after our report):

'Excluding this revenue, net revenue was $608.4 million and $203.7 million for the three months ended June 30, 2021 and 2020, respectively, an increase of $404.7 million. The increase in net revenue was driven primarily by <u>acquisitions completed after April 1, 2020, which increased net revenue by $405.3 million</u>…'

123.    The Update Report explains the subtle difference above, the "company has gone from quantifying <u>only</u> the revenues contributed by this quarter's deals, to quantifying the revenues contributed by all deals in the past twelve months. (If you don't have the latter, there's no way you can calculate organic growth.)"

124.    The Update Report further alleged that its previous allegations were confirmed:

**With the new numbers, including the YTD disclosures on Page 1 of this update, organic growth exB2B is easily quantified: -8% in Q121 and just under 0% in Q221.** Also, we now have further confidence in our original report's methodology that calculated negative organic growth in Q320 and Q420, and that calculated around zero over time. We knew our math was basically right, but now it's a little tighter. And as we've said before, the best comp to this business, Apria (APR), has low-single-digit organic growth over time. The 8-10% fiction was created to sell stock.

• This new disclosure is enough for anyone to understand with virtually no work done: organic growth for AHCO is flat to (deeply) negative. **We didn't have that ironclad confirmation before. We have it now. From here it's just a question of when the market begins to price it in.**

**<u>The False and Misleading Proxy Statements</u>**

125.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements during the Relevant Period. The Company filed a Form DEF 14A on January 20, 2021 (the "January 2021 Proxy") and the July 2021 Proxy.[3]

126.    The January 2021 Proxy and July 2021 Proxy, are collectively referred to herein as the "Proxies."

***January 2021 Proxy***

---

[3] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

127.    The January 2021 Proxy recommended shareholders vote to approve the issuance of Class A common stock upon conversion of Series C Preferred Stock. The January 2021 Proxy reiterated materially false and misleading statements regarding the Company's organic growth:

**Business Strategy**

AdaptHealth aims to grow its revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of AdaptHealth's scalable, integrated technology platform.

**Drive Market Share Gains in the HME Market**:   AdaptHealth plans to leverage its technological and clinical advantages as well as its relationships with key constituents across the HME supply chain to deepen its presence in the HME market. AdaptHealth has built a strong network of highly diversified referral relationships that its sales force will continue to grow to help expand market penetration in certain geographies. Primary referral sources include acute care hospitals, sleep laboratories, pulmonology offices, skilled nursing facilities and hospice operators, with no one source accounting for a material portion of its revenue as of September 30, 2020. AdaptHealth believes that maintaining and broadening these relationships will drive organic growth. AdaptHealth's ability to provide many products across its contracted payors is particularly valuable, especially to providers and facilities that discharge patients with a variety of product needs and insurance coverages. While some of AdaptHealth's HME competitors focus on certain specific product lines, AdaptHealth is able to offer a wide array of products to its customers. AdaptHealth believes that its strong referral relationships and broad product portfolio will help drive market share growth.

***

**Competitive Strengths**

AdaptHealth believes that the following strengths will continue to enable it to provide high-quality products and services to its customers and to create value for stockholders:

**Differentiated Technology-Enabled Platform**: Over the last five years, AdaptHealth has developed an integrated technology system (based upon leading third-party applications and proprietary software products) which AdaptHealth believes provides a competitive advantage within the HME industry. AdaptHealth's integrated platform distinguishes itself from other industry participants by automating processes that can be complex, prone to mistakes and inefficient. AdaptHealth believes that its platform's ease of use, improved compliance and automated, integrated workflow for delivery of care appeals to physicians and payors. Additionally, AdaptHealth believes its adoption of e-prescribing solutions

43

enhances transparency and reduces clinical errors and delays. AdaptHealth believes such systems provide better patient service by reducing the time between an order's receipt and the delivery of the products to the patient. AdaptHealth believes its model is scalable, supporting future organic growth while also allowing for timely on-boarding of acquisitions. AdaptHealth believes that this differentiated technology platform will help generate business from new clients, as other competitors either lack the resources to modernize their infrastructure or utilize systems which do not easily allow for changes from traditional, less automated models.

***

**Sales and Marketing**

Sales activities are generally carried out by AdaptHealth's full-time sales representatives with assistance from on-site liaisons in certain markets who interact directly with hospital discharge coordinators and patients. AdaptHealth's sales team works closely with AdaptHealth's trained respiratory therapists in carrying out their daily sales activities. AdaptHealth primarily acquires new patients through referrals. Sources of referrals include acute care hospitals, sleep laboratories, pulmonologist offices, skilled nursing facilities and hospice operators, among others. AdaptHealth's sales representatives maintain continual contact with medical professionals across these facilities. AdaptHealth believes that its relationships with its referral sources are strong and that these entities will continue to be a source of organic growth through new patients. While AdaptHealth views its referral sources as fundamental to its business, no single referral source accounted for more than a material portion of its revenue as of September 30, 2020.

128.     The January 2021 Proxy also reiterated claims regarding the Company's

"experienced management team" which included Defendant McGee:

**Experienced Management Team**:   AdaptHealth is led by a proven management team with significant experience in the HME and healthcare services industries. The team has domain knowledge within the industry having been employed at various healthcare organizations throughout their careers. Multiple members of the management team have also built independent HME companies and have the proven ability to scale a business within the HME industry. Additionally, several members of the management team have experience within their specific roles in both private and public company settings. Given the complexity of the highly regulated industry in which AdaptHealth operates, AdaptHealth believes that management's experience is a meaningful differentiator relative to its competitors.

***

*Management.*   AdaptHealth is led by a proven management team with experience

44

in the HME industry across a variety of healthcare organizations. AdaptHealth adopts a centralized approach for key business processes, including M&A activity, revenue cycle management, strategic purchases, payor contracting, finance, compliance, legal, human resources, IT and sales management. In addition, AdaptHealth has centralized many of the functions relating to its CPAP and other resupply businesses. However, AdaptHealth believes that the personalized nature of customer requirements and referral relationships, characteristic of the home healthcare business, mandates that it emphasize a localized operating structure as well. AdaptHealth focuses on regional management to respond promptly and effectively to local market demands and opportunities. AdaptHealth's regional managers are responsible and accountable for maintaining and developing relationships with referral sources, customer service for non-CPAP supply product lines and logistics for non-drop-shipped products.

129.    The January 2021 Proxy did not disclose, however, that the Company's organic growth had been misstated and that Defendant McGee was under criminal investigation by Danish authorities.

*July 2021 Proxy*

130.    The July 2021 Proxy recommended shareholders vote to elect Defendants Connors, Lundberg, Parnes, and Williams; ratify the selection of an independent registered public accounting firm; approve an amendment to the Certificate of Incorporation; and approve an amendment to the 2019 Stock incentive Plan.

131.    The July 2021 Proxy contained an Audit Committee Report which stated the following, in relevant part:

> Our audit committee has reviewed our audited consolidated financial statements for the fiscal year ended December 31, 2020 and discussed them with our management and our independent registered public accounting firm, KPMG LLP.
>
> Our audit committee has also received from, and discussed with, KPMG LLP various communications that KPMG LLP is required to provide to our audit committee, including the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the Public Company Accounting Oversight Board.
>
> In addition, our audit committee has received the written disclosures and the letter from KPMG LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding KPMG LLP's communications with our

audit committee concerning independence, and has discussed with KPMG LLP their independence.

Based on the review and discussions referred to above, our audit committee has recommended to the board of directors that the audited consolidated financial statements be included in the Annual Report on Form 10-K (as amended) for the year ended December 31, 2020, filed by us with the SEC.

Respectfully submitted,
**The Audit Committee of the Board of Directors**

Dale Wolf
Alan Quasha
Terence Connors
Ted Lundberg
Bradley Coppens

132.    The July 2021 Proxy was false and misleading because, while it assured investors that, it would keep stockholders informed and that its Audit Committee reviewed filings, including the 2020 10-K, that was not the case as revealed by the Report. The Report clearly shows that the Individual Defendants allowed each other and the Company to issue false and materially misleading statements during the Relevant Period. The July 2021 Proxy also recommended shareholders elect Defendants Connors, Lundberg, Parnes, and Williams.

## **FIDUCIARY DUTIES**

133.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe AdaptHealth and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage AdaptHealth in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of AdaptHealth and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

134.    Each Individual Defendant owed and owes AdaptHealth, and its stockholders, the

fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

135.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of AdaptHealth, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with AdaptHealth, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

136.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

> (a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

> (b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

> (c)    remain informed as to how AdaptHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

> (d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Ethics & Business Conduct**

137.   The Individual Defendants, as officers and/or directors of AdaptHealth, were bound by the Company's Code of Ethics & Business Conduct[4] (the "Code of Conduct") which required the following:

> This Code of Ethics and Business Conduct (hereafter referred to as "Code") reinforces the Company's commitment to the highest ethical and legal standards and provides each employee, officer, and director of the Company (hereafter collectively referred to as "Covered Persons") with guidance and perspective in understanding business ethics at AdaptHealth.
>
> ***
>
> Every Covered Person is required to understand and comply fully with both the rules and approval procedures established by this Code.
>
> ***
>
> **All AdaptHealth Covered Persons are required to comply with all federal, state, and local laws and regulations.** In addition, all Covered Persons are subject to the Company's Insider Trading Policy relating to transactions in the Company's securities and the securities of other companies. Covered Persons are obligated to report any actual or perceived violation of any applicable law or regulation, this Code, the Corporate Compliance Program, the Insider Trading Policy or any other AdaptHealth policy through the appropriate channels provided under the heading "How to File a Report" in this Code.
>
> ***
>
> Financial Recording – **AdaptHealth requires honest and accurate recording and reporting of financial information in order to make responsible business decisions.** All financial books, records and accounts must accurately reflect transactions and events and conform to generally accepted accounting principles and to AdaptHealth's system of internal controls. It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.
>
> Examples of unethical financial or accounting practices include, but are not limited to:
>
> A. **Making false entries that intentionally hide or disguise the true nature of**

---

[4] *See* AdaptHealth's Code of Conduct:
https://adapthealth.com/wp-content/uploads/2021/11/AdaptHealth-Code-of-Ethics-10-2021-Clean.pdf.

**any transaction**.
B. Improperly accelerating or deferring the recording of expenses or revenues to achieve financial results or goals.
C. Maintaining any undisclosed or unrecorded funds or "off the books" assets.
D. **Establishing or maintaining improper, misleading, incomplete or fraudulent account documentation or financial reporting**.
E. **Signing any document believed to be inaccurate or untruthful**.

(Emphasis added).

138. The Individual Defendants failed to adhere to the Code of Conduct when they failed to disclose the organic growth trajectories disclosed in the statements described herein were materially false and misleading and omitted that Defendant McGee was under criminal investigation.

139. In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to AdaptHealth under the Audit Committee Charter (the "Audit Charter").[5] Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

The Committee is appointed by the Board for the primary purposes of:

Performing the Board's oversight responsibilities as they relate to the Company's accounting policies and internal controls, financial reporting practices and legal and regulatory compliance, including, among other things:

- the quality and integrity of the Company's financial statements;
- the Company's compliance with legal and regulatory requirements;
- review of the independent registered public accounting firm's qualifications and independence;
- the performance of the Company's internal audit function and the Company's independent registered public accounting firm;
- maintaining, through regularly scheduled meetings, a line of communication between the Board and the Company's financial management, internal auditors and independent registered public accounting firm, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a periodic basis; and

---

[5] *See* AdaptHealth's Audit Charter at:
https://adapthealth.com/wp-content/uploads/2019/11/AdaptHealth-_-Audit-Committee-Charter.pdf.

- preparing the report to be included in the Company's annual proxy statement, as required by SEC rules.

***

3. <u>Duties and Responsibilities.</u> In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best address, react or respond to changing circumstances or conditions. The following duties and responsibilities are within the authority of the Committee and the Committee shall, consistent with and subject to applicable law and rules and regulations promulgated by the SEC, NASDAQ, or any other applicable regulatory authority:

(a) Review and discuss the annual audited financial statements and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management and the independent registered public accounting firm…

(b) Review and discuss the quarterly financial statements and the Company's disclosures provided in periodic quarterly reports including "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management, the internal auditors and the independent registered public accounting firm.

(c) Oversee the external audit coverage. The Company's independent registered public accounting firm is ultimately accountable to the Committee, which has the direct authority and responsibility to appoint, retain, compensate, terminate, select, evaluate and, where appropriate, replace the independent registered public accounting firm…

(d) Oversee internal audit coverage…

(x) Inquire and discuss with management the Company's compliance with applicable laws and regulations.

140.    The Audit Committee Defendants failed to uphold their duties required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding the Company's organic growth and Defendant McGee's criminal activity.

## BREACHES OF DUTIES

141.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of AdaptHealth, the absence

of good faith on their part, and a reckless disregard for their duties to the Company.

142.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the Company's organic growth as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused AdaptHealth substantial damage.

143.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee AdaptHealth's public statements and internal control function.

144.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of AdaptHealth, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, AdaptHealth has expended, and will continue to expend, significant sums of money.

## DAMAGES TO ADAPTHEALTH

145.    The materially false and misleading statements regarding organic growth have exposed the Company to myriad reputational and financial damages, including but not limited to:

(a)    Possible restatements and goodwill impairments;

51

(b)     Liability arising from the Federal Securities Class Action;

(c)     The loss of credibility with customers and suppliers; and

(d)     Legal costs associated with litigation, investigations, and restatements.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff brings this action derivatively and for the benefit of AdaptHealth to redress injuries suffered, and to be suffered, because of the Individual Defendants' insider trading, breaches of their fiduciary duties as directors and/or officers of AdaptHealth, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

147.    AdaptHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148.    Plaintiff is, and has been, a stockholder of AdaptHealth. Plaintiff will adequately and fairly represent the interests of AdaptHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

149.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

150.    A pre-suit demand on the Board of AdaptHealth is futile and, therefore, excused. At the time of filing this action, the Board consists of Individual Defendants Griggs, Parnes, Barasch, Connors, Weaver, Wolf, Williams, Coppens, and Lundberg (the "Director Defendants"), along with Greg Belinfanti, who is not a defendant in these proceedings. The Director Defendants and Greg Belinfanti are collectively referred to herein as the "Demand Directors." Plaintiff needs only to allege demand futility as to half (five) of the directors who are on the Board at the time this action is commenced.

151.    Demand is excused as to all of the Director Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

152. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153. Demand on Defendant **Griggs** is futile because Griggs has served as a Company director since February 2021. He has received and continues to receive compensation for his roles as a director and as CEO as described herein. Defendant Griggs signed and thus personally made the materially false and misleading statements in the 1Q 2021 10-Q. He also personally made false and misleading statements and omitted the truth regarding organic growth during the May 6, 2021 earnings call. Defendant Griggs is a named defendant in the Federal Securities Class Action. Additionally, the July 2021 Proxy admits that Griggs is not independent and as CEO, he is beholden to Defendants Barasch, Connors, Weaver, Wolf, Williams, Coppens, and Lundberg, who all face a substantial likelihood of liability. Defendants Barasch, Connors, Weaver, Wolf, Williams, Coppens, and Lundberg control Defendant Grigg's primary source of income. For these reasons, he breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested from Defendants Barasch, Connors, Weaver, Wolf, Williams,

Coppens, and Lundberg, and thus demand upon him is futile and, therefore, excused.

154.    Demand on Defendant **Parnes** is futile because he has served as a Company director since the closing of the Business Combination. Defendant Parnes signed and thus personally made the materially false and misleading statements in the 2019 10-K and the 2020 10-K. He attended the earnings call on May 6, 2021 when Defendants Griggs and Clemens made false and misleading statements to the public and failed to correct their statements. Defendant Parnes is a named defendant in the Federal Securities Class Action.  Additionally, the July 2021 Proxy admits that Parnes is not independent and as the Company's President, he is beholden to Defendants Barasch, Connors, Weaver, Wolf, Williams, Coppens, and Lundberg, who all face a substantial likelihood of liability. Defendants Barasch, Connors, Weaver, Wolf, Williams, Coppens, and Lundberg control Defendant Parnes' primary source of income. For these reasons, he breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested from Defendants Barasch, Connors, Weaver, Wolf, Williams, Coppens, and Lundberg, and thus demand upon him is futile and, therefore, excused.

155.    Demand on Defendant **Connors** is futile because he has served as a director since the closing of the Business Combination. He has received and continues to receive compensation for his role as a director as described herein and has been Chair of the Audit Committee since the start of the Relevant Period. Defendant Connors is a named defendant in the Federal Securities Class Action.  Defendant Connors signed and thus personally made the materially false and misleading statements in the 2019 10-K and the 2020 10-K. For these reasons, Defendant Connors breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Demand on Defendant **Lundberg** is futile because he has served as a director since

February 2021. He has served as a member of the Audit Committee during the Relevant Period. Defendant Lundberg signed and thus personally made the materially false and misleading statements in the 2020 10-K. For these reasons, Defendant Lundberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Demand on Defendant **Coppens** is futile because he has served as a Company director since July 2020. He has received and continues to receive compensation for his role as a director as described herein and has served as a member of the Audit Committee during the Relevant Period. Defendant Coppens is a named defendant in the Federal Securities Class Action. Defendant Coppens signed and thus personally made the materially false and misleading statements in the 2020 10-K. For these reasons, Defendant Coppens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Demand on Defendant **Wolf** is futile because he has served as a Company director since the closing of the Business Combination. He has received and continues to receive compensation for his role as a director as described herein and has served as a member of the Audit Committee since the start of the Relevant Period. Defendant Wolf is a named defendant in the Federal Securities Class Action.  Defendant Wolf signed and thus personally made the materially false and misleading statements in the 2019 10-K and the 2020 10-K. For these reasons, Defendant Wolf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Demand on Defendant **Barasch** is futile because he has served as Chairman of the Board since the Company's formation. He has received and continues to receive compensation for

his role as a director as described herein. Defendant Barasch is a named defendant in the Federal Securities Class Action.  Defendant Barasch signed and thus personally made the materially false and misleading statements in the 2019 10-K and the 2020 10-K. For these reasons, Defendant Barasch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Demand on Defendant **Weaver** is futile because Weaver has served as a Company director since February 2018. She has received and continues to receive compensation for her role as a director as described herein. Defendant Weaver is a named defendant in the Federal Securities Class Action.  Defendant Weaver signed and thus personally made the materially false and misleading statements in the 2019 10-K and the 2020 10-K. For these reasons, Defendant Weaver breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

161.    Additionally, Defendant Weaver received a material personal benefit when she sold stock at artificially inflated prices during the Relevant Period while in possession of adverse material non-public information. Therefore, Defendant Weaver's insider sale is a material personal benefit that would be the subject of a litigation demand, and thus demand upon her is futile and, therefore, excused.

162.    Demand on Defendant **Williams** is futile because he has served as a Company director since July 2020. He has received and continues to receive compensation for his role as a director as described herein. Defendant Williams is a named defendant in the Federal Securities Class Action. Defendant Williams signed and thus personally made the materially false and misleading statements in the 2020 10-K. For these reasons, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and

thus demand upon him is futile and, therefore, excused.

163.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

164.     Pursuant to the Company's Audit Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

165.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including insider trading, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of

interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

166.    AdaptHealth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Demand Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AdaptHealth any part of the damages AdaptHealth suffered and will continue to suffer thereby. Thus, any demand upon the Demand Directors would be futile.

167.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Demand Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

168.    The acts complained of herein constitute violations of fiduciary duties owed by AdaptHealth's officers and directors, and these acts are incapable of ratification.

169.    Thus, for all the reasons set forth above, all the Director Defendants, and, if not all of them, at least a majority (five) of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants McGee and Weaver**
*for Insider Trading*

58

170.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.     When Defendants McGee and Weaver sold over $38.5 million worth of stock, they were in possession of material, non-public information regarding the Company's true organic growth and the tax scheme, both of which would have an adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Defendant McGee's involvement in the tax scheme and the Company's true organic growth would destroy millions in market capitalization when revealed to the market.

172.     The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by AdaptHealth insiders. The information which formed the basis of the sales of stock made by Defendants McGee and Weaver was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to AdaptHealth, which was usurped for the benefit of Defendants McGee and Weaver and to the detriment of the Company.

173.     The use of this information by Defendants McGee and Weaver was a breach of their fiduciary duty of loyalty. Their insider sales of stock in December 2020 and March 2021 were predicated upon their possession of material, adverse, non-public information to which they had access as AdaptHealth insiders.

174.     Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

175.     Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

177.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

178.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

179.    The July 2021 Proxy stated that the Company's directors and employees are subject to the Company's Code of Conduct.  The July 2021 Proxy was false and misleading because, despite assertions to the contrary, AdaptHealth's compliance with its Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein. Further, the January 2021 Proxy reiterated misleading

statements regarding the Company's organic growth and "experience[d] management team" which included Defendant McGee who was under criminal investigation by Danish authorities at the time.

180.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, the approval of an amendment to the Company's certificate of incorporation, approval of an amendment to the 2019 stock incentive plan, and the approval of the issuance of the issuance of Class A common stock upon conversion of Series C Preferred stock to equityholders of AeroCare. The issuance of Class A common stock to equityholders of AeroCare was in connection with a merger agreement with AeroCare which brought on Defendant Griggs as Co-CEO and Defendant Lundberg as a director.

181.    The false and misleading elements of the annual Proxies led to the re-elections of Defendants Connors, Lundberg, Parnes, and Williams, allowing them to continue breaching their fiduciary duties to AdaptHealth.

182.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

183.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

184.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

185.    The Individual Defendants, by virtue of their positions with AdaptHealth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AdaptHealth and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause AdaptHealth to engage in the illegal conduct and practices complained of herein.

186.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AdaptHealth's business and affairs.

189.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

190.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AdaptHealth.

191.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

192.    In further breach of their fiduciary duties, the Individual Defendants failed to

maintain an adequate system of oversight, disclosure, controls, and procedures.

193.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that AdaptHealth was on track to achieve strong organic growth, yet failed to disclose the following major problems: (i) that the Company's organic growth metric had been replaced with a new formula; (ii) other than a vague footnote, how organic growth was being calculated; (iii) how the Company's actual revenue growth, excluding revenue growth attributable to recent acquisitions, was declining; (iv) that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined by Danish authorities; (v) that Defendant McGee was named indirectly in the Denmark Complaint; (vi) that Defendant McGee remained under criminal investigation in Denmark; and (vii) as a result, the Company's disclosures regarding organic growth and Defendant McGee were materially false and misleading.

194.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

195.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

196.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

197.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

198.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AdaptHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

199.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of AdaptHealth.

202.    The Individual Defendants either benefitted financially from the improper conduct,

received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from AdaptHealth tied to the performance or artificially inflated valuation of AdaptHealth, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

203.     Plaintiff, as a stockholder and a representative of AdaptHealth, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

204.     Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

205.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and AdaptHealth will lose financing from investors and business from future customers who no longer trust the Company and its products.

207.     Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

208.     Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## PRAYER FOR RELIEF

209.     **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor

against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of AdaptHealth, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to AdaptHealth;

C.      Determining and awarding to AdaptHealth the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing AdaptHealth and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect AdaptHealth and its stockholders from a repeat of the damaging events described herein;

E.      Awarding AdaptHealth restitution from Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: December 6, 2021                         Respectfully submitted,


                                                */s/ Barbara L. Gibson*
                                                   Barbara L. Gibson
                                                **KOHN, SWIFT & GRAF, P.C.**
                                                Joseph C. Kohn
                                                Stephen H. Schwartz
                                                Barbara L. Gibson
                                                1600 Market Street, Suite 2500
                                                Philadelphia, PA 19103
                                                Telephone: (215) 238-1700

66

jkohn@kohnswift.com
sschwartz@kohnswift.com
bgibson@kohnswift.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Ryan C. Messina
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Carol Hessler*

**CERTIFICATE OF SERVICE**

I, Barbara L. Gibson, hereby certify that on December 6, 2021, the

foregoing VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT was filed electronically

with the Court's ECF system, which sends electronic notice to counsel of record for all parties.

*/s/ Barbara L. Gibson*
Barbara L. Gibson