UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL HESSLER, | . | Case No. 2:21-CV-05335-GJP |
| v. | . | |
| ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP, et al., | . | James A. Byrne U.S. Courthouse<br>601 Market Street<br>Philadelphia, PA 19106 |
| Defendants. | . | November 13, 2024<br>10:04 a.m. |

. . . . . . . . . . . . . .

TRANSCRIPT OF SETTLEMENT HEARING
BEFORE THE HONORABLE GERALD J. PAPPERT
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Levi & Korsinsky, LLP<br>By: DANIEL TEPPER, ESQ.<br>33 Whitehall Street, 17th Fl.<br>New York, NY 10004 |
| | Kohn, Swift & Graf, P.C.<br>By: JOSEPH C. KOHN, ESQ.<br>WILLIAM E. HOESE, ESQ.<br>1600 Market Street, Suite 2500<br>Philadelphia, PA 19103 |

APPEARANCES CONTINUED.

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (Cont'd):

| | |
|---|---|
| For Defendant AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp.: | Willkie Farr & Gallagher, LLP<br>By: ZEH S. EKONO, ESQ.<br>787 7th Avenue<br>New York, NY 10019 |
| | Saxton & Stump, LLC<br>By: STEVEN D. COSTELLO, ESQ.<br>280 Granite Run Drive, Suite 300<br>Lancaster, PA 17601 |
| For Defendant Luke McGee: | Kramer Levin Naftalis & Frankel, LLP<br>By: RYAN GANDER, ESQ.<br>1177 Avenue of the Americas<br>New York, NY 10036 |
| Audio Operator: | Jeff Lucini |

MR. KOHN: -- Your Honor. Good to see you.

THE COURT: Good to see you.

MR. KOHN: Yeah.

THE COURT: Yeah.

MR. KOHN: It's good to be in your courtroom.

THE COURT: Likewise.

MR. KOHN: It's been a long time.

THE COURT: Well, thank you. It's good to have you here.

MR. KOHN: Thank you.

THE COURT: And Mr. Tepper?

MR. TEPPER: Yes, Your Honor. Good morning. How are you?

THE COURT: I'm doing well.

And is it -- how do I pronounce it?

MS. EKONO: It's -- oh.

MR. HOESE: Hoese, Your Honor.

THE COURT: Hoese.

MS. EKONO: Oh, okay.

THE COURT: That's what I was going to say. All right.

MR. HOESE: Good morning, Your Honor.

THE COURT: Good. And we have Ms. Ekono?

MS. EKONO: Yes. Zeh Ekono.

THE COURT: Did I say that right?

MS. EKONO: Yes. Yes. Nice to be here.

THE COURT: And Mr. Costello?

MR. COSTELLO: Yes, Your Honor. Good morning.

THE COURT: Good morning.

And Mr. Gander?

MR. GANDER: Yes, Your Honor.

THE COURT: There you are.

MR. GANDER: Good morning.

THE COURT: And we'll let you sit at the big table.

MR. GANDER: Representing separate defendants.

MR. COSTELLO: That was his choice, Your Honor.

THE COURT: All right. All right. But everybody's friends here today.

MR. COSTELLO: Exactly.

MS. EKONO: Yes.

THE COURT: Everybody's friends here today.

Okay. So look, I've read all your papers. Thank you for them. They're very good. This is all very straightforward. I'm happy to hear from counsel to the extent you'd like to just put on the record and outline the reasons why the settlement here is fair, reasonable, adequate, and in the best interest of the parties. And I have a few questions, which I can throw in at the right time.

MR. TEPPER: May I proceed to the podium, Your Honor?

THE COURT: Come on up.

MR. TEPPER: Thank you.

THE COURT: Yeah. Please.

MR. TEPPER: All right. Your Honor, Daniel Tepper from Levi & Korsinsky in New York on behalf of the plaintiff.

THE COURT: So your name didn't change between when you were sitting there and when you got here, so that's a good start.

MR. TEPPER: Not to my knowledge, Your Honor.

THE COURT: All right. Okay.

MR. TEPPER: Thank you for making the time to hear us today. As Your Honor mentioned, we're here to consider the approval of the settlement of this stockholder derivative action brought by the plaintiff, Carol Hessler, against certain current and former officers and directors of AdaptHealth Corp. for breaches of fiduciary duty and related misconduct in connection with certain omissions in the company's public filings concerning its business prospects and its former CEO's ties to a Danish tax fraud scheme.

The settlement negotiations here were overseen by David Murphy of Philips ADR, who is a retired partner at Wachtell, Lipton, Rosen & Katz in New York.

THE COURT: And how many sessions did you have with Mr. Murphy?

MR. TEPPER: We --

THE COURT: The papers say multiple, I think.

MR. TEPPER: We had multiple. We had, I believe, at least four in-person sessions and substantially more virtual or telephone sessions. And these mediations were divided into two parts. The first part was for the substance of the settlement, that is the consideration that will underlie the release. And after the settlement terms were agreed upon, only then did the parties move to the matter of attorneys' fees. And there were a number of sessions about attorneys' fees as well, but after the principal settlement terms were agreed upon, as is required by the rules and the practices for representative litigation.

So the mediation was very contentious and hard-fought. Like I said, there were a number of sessions. And we think the result here is a good one.

Before I get into that, I'd like to bring the Court up to speed on what's happened since the Court granted preliminary approval of the settlement on June 25th. The preliminary approval order, among other things, directed that notice of the proposed settlement be given in the form and manner outlined in the stipulation. It was a robust notice program. Notice was going to be mailed to the company's stockholders of record and their nominees. It was going to be published in the Wall Street Journal. A press release was going to be issued over PR Newswire, and a website was going to be set up by the settlement administrator.

And all of that has been done. A declaration

regarding administration of notice was filed by a representative of Kroll Settlement Administration explaining how notice was effected and including that paper and electronic notice was delivered to 21,431 stockholders. That is a very robust notice program, in my opinion.

The deadline set forth in the notice for any objections to the settlement was October 23rd. And as far as we know, no stockholder has objected either before or after that date, which we view as a tacit acknowledgment that the stockholders approve of the proposed settlement.

So this case was originally filed in December of 2021. And instead of moving to dismiss, the defendants proposed to enter into a stay pending the resolution of a related securities fraud class action that was pending before Judge Bartle.

THE COURT: And how, if at all, should the settlement in that related class action affect how I look at this settlement, A, on the merits, and B, with respect to the attorney's fees?

MR. TEPPER: Well, with respect to the merits, that was a monetary settlement to a class of stockholders who bought their stock at artificially inflated prices, allegedly. It was a $55 million settlement, and the attorney's fees were 25 percent of that. So the fact that the --

THE COURT: Separate counsel?

MR. TEPPER: Separate counsel. Correct. Well, separate plaintiff's counsel. Typically, that is the appropriate way to do it, because there is a tension between representing a class of stockholders who are suing the company as opposed to representing a stockholder who is bringing a derivative suit on behalf of the company. So it would be inappropriate for --

THE COURT: Are they often -- do they often go together? This is the first one I think I've seen where we've had both. Is it --

MR. TEPPER: They --

THE COURT: Is it relatively common?

MR. TEPPER: They don't always go together, but they frequently do go together. I won't say they always or typically go together, but it's certainly frequent. It's definitely not uncommon. I would even say it's common.

And the reason for that is because you have a higher pleading standard. In federal securities litigation, you have to plead scienter to a very high standard. And if a case survives a motion to dismiss, that tends to suggest that there is something there that is worth exploring, in a derivative litigation context, a breach of fiduciary duty that led the company to this very bad place. And the company will typically suffer damages at a minimum, at least in the form of defending against a securities class action.

So they are -- I would say it's common. It's not necessarily always. Oftentimes you have stockholder --

THE COURT: Do you ever have any aspect of the class action -- is there ever any aspect of the class action which is relevant in any way for any purpose to the derivative action?

MR. TEPPER: Yes. I would say very often it's relevant. In a case like this, for example, as part of the stay, we received the discovery that was exchanged in the federal securities class action. We also received copies of depositions. And had this case proceeded, we could have used those documents to draft a very informed amended complaint. To the extent that the allegations in a federal securities class action bear on directors' state of mind, that might help in pleading demand futility, which is a threshold issue in derivative litigation.

And demand futility I don't want to speak about. I'm sure Your Honor is familiar with it. But it's typically -- it's often a very difficult thing for a plaintiff to plead with sufficient particularity in a derivative case.

So particularly if a securities class action has adequately pleaded scienter, that would help a plaintiff in a stockholder derivative action piggyback on a lot of those allegations, to the extent they're relevant, and plead demand futility with the appropriate level of particularity such that we would be able to survive a motion to dismiss.

That's academic. Not necessarily, you know --

THE COURT: Right.

MR. TEPPER: -- what happened in this case. And I'm not suggesting that we would have been able to meet that burden in this case, although I'd like to think that we would have.

THE COURT: Were there -- I know that there was -- you said it was $55 million in the class action.

MR. TEPPER: Correct.

THE COURT: Did that settlement contain any governance measures? And if so, how do they differ from what you've accomplished in this case?

MR. TEPPER: I do not believe that it contained any governance measures, because the recovery in a securities class action is for the benefit of the class. So it's a consideration that a stockholder would receive to make him or her whole for the damage to his or her financial interest as a stockholder in the company. Governance does not accomplish this. Governance benefits the company and only indirectly benefits the stockholder. So that's sort of why -- that's one of the big reasons why there are two tracks in this kind of litigation.

Corporations are legal persons, of course, but they don't act by themselves. They act through people. They act through their board of directors. They act through their officers and directors. And officers and directors cause

corporations to do things. And very often, if there is a breach of fiduciary duty, it's not just the stockholder who's harmed by that, but the corporation is harmed by that as well. And that is the purpose -- or one of the purposes of a stockholder derivative action is to remediate the harm caused to the corporation by some of this misconduct.

So if I may continue, Your Honor?

THE COURT: Absolutely.

MR. TEPPER: Thank you. AdaptHealth is a home medical equipment company which, under the leadership of its former CEO, Defendant Luke McGee, it grew very quickly through over 60 acquisitions before it went public in 2019. Plaintiff's allegations in this case center on two issues. The first issue is, starting in late 2020, the company changed how it measures organic growth in its financial statements to a nonstandard definition which made that number look higher without adequately disclosing that this was done to the company's stockholders.

The second area that this litigation focuses on is that the company failed to disclose that Mr. McGee had been charged in Denmark in a tax fraud scheme where he paid a $16 million fine and repaid $220 million to the Danish government. And as soon as these facts became public, as soon as the company learned about it, Mr. McGee was removed from his position at the company.

If defendants had moved to dismiss, as I mentioned --

THE COURT: Was there ever any indication that anyone else in a higher-ranking spot in the company knew about any of these problems?

MR. TEPPER: I don't believe so, Your Honor. And some of the governance enhancements that we negotiated to resolve this case are intended to mitigate this exact problem. One of the enhancements is that the directors are now going to have to submit questionnaires to the company which will be developed with the assistance of counsel according to best practices. And so the company should be, going forward, informed of potential issues such as this and hopefully avoid them in the future.

THE COURT: Was that his only trouble, Mr. McGee, and once he resolved that --

MR. TEPPER: I mean, that's a pretty big trouble.

THE COURT: Yeah. No, no. I'm not minimizing it, but some -- it wouldn't be -- it wouldn't shock me to see that someone who had done that somewhere did it somewhere else.

MR. TEPPER: I don't know --

THE COURT: That was the extent of his issues?

MR. TEPPER: As far as I know, that was the extent of Mr. McGee's issues as they relate to the company.

THE COURT: Yeah. Okay.

MR. TEPPER: So we would have had -- to have this

case moved forward, we would have had to satisfy the threshold issue of demand futility, which is a pleading issue. And in order to do that, we would have been required to allege with particularity that at least half of the directors who were in place at the time that this lawsuit was filed -- so not half of the directors who were in place during the period of wrongdoing, but half of the directors who were in place at a later date when the case was filed -- either lack independence from Mr. McGee or face a substantial likelihood of liability because they acted in bad faith.

And that would have been a very challenging thing to do. Most likely it would have been a circumstantial case for alleging bad faith. And the board would have some pretty good defenses that they did not allow this to happen in bad faith, starting with the fact that they removed Mr. McGee as soon as news about his Danish legal problems broke. And also, had this case proceeded to trial, it would have been challenging to quantify the company's damages with any degree of precision, and equitable relief would have been very difficult to achieve at trial.

So that, Your Honor, is where things stood when the parties began to talk in June of 2023. The parties agreed to mediate with Mr. Murphy. As I mentioned, it was a very lengthy and contentious mediation process. And the mediation over attorneys' fees, which followed the parties' agreement to the

terms of the settlement, were contentious as well and also needed Mr. Murphy's help to get us over the line.

So with that background, I'd like to turn to the settlement terms, if that's all right with Your Honor.

THE COURT: It is.

MR. TEPPER: Thank you. There are two components to this settlement. The first is the appointment of a new independent director. The second is the adoption of certain governance enhancements, which are tailored to prevent a recurrence of the alleged misconduct.

The value of a new independent director who will join the board after the company turned the page, the value of that, I think, is significant and self-evident. As to the governance enhancements, there are seven of them. The first is that the company is going to do a postmortem analysis with legal counsel to review the disclosures that were at issue in this case and figure out exactly how things went wrong here and what they can do to prevent this from happening again.

As I mentioned going forward, the second, the directors will have to submit questionnaires which are consistent with best practices.

The third is that the nominating committee of the board is going to analyze board composition for skills and expertise to ensure that the board has a diversity of skills and expertise to avoid group think. And that will lead to

better governance.

There will also be enhanced reporting about management wrongdoing, whistleblower complaints, and concerns about SEC disclosures, including giving independent directors and officers the power to convene an audit committee meeting to discuss these issues anytime they feel it's warranted to do so. The audit committee now will also review the company's SEC disclosures. And under listing rules, the audit committee has to consist of independent directors. But the audit committee now will review the company's SEC disclosures with the help of the general counsel, chief compliance officer, and management.

THE COURT: A couple questions. I mean, part of me thinks that a lot of this would have gotten done or should have gotten done by the company anyway coming out of this, right? Some of these things are measures which a responsible company, after what happened, would have taken a look and said, you know, here's some things we've got to put in place to make sure we're not on the wrong end of another lawsuit over stuff like this.

MR. TEPPER: Uh-huh.

THE COURT: How much should I credit the litigation which -- with bringing these changes about as opposed to just the company doing it on its own?

MR. TEPPER: Well, the company -- the fact is, Your Honor, the company did not do it on its own. And it took this

litigation -- and not just the filing of this litigation, but many mediation sessions -- for the company to come around and actually do these things. And, of course, there's the appointment of the new independent director, which is --

THE COURT: That's a little harder to swallow.

MR. TEPPER: A little harder, right.

THE COURT: Yeah.

MR. TEPPER: But I agree. Certain of these governance enhancements are things that maybe the company should have done anyway, but it didn't, and it wouldn't have if it weren't for this litigation. And --

THE COURT: And you can tell -- you can say that with relative confidence because of how hard you had to negotiate to get them done?

MR. TEPPER: I can say that with relative -- with complete confidence for two reasons. The first is what Your Honor just mentioned, and the second reason is that defendants have expressly agreed and represented in the stipulation of settlement that this case was the cause for these governance enhancements and also that these governance enhancements confer substantial benefits upon the company.

THE COURT: With the governance enhancements being the real, you know, meat of the settlement, how am I supposed to look at those Girsh factors which call for me to determine how the company might have been able to withstand a greater

judgment, you know, et cetera? Are some of these just not applicable in certain settlements, and they're a wash?

MR. TEPPER: Right. Well, I don't know the -- I don't know that I agree with the premise that the governance enhancements are the real meat of the settlement. The governance enhancements are certainly important, but I don't want to undersell the importance of a new independent director either. That is a real get.

THE COURT: Isn't that all just -- that's wrapped up in the governance enhancements, right?

MR. TEPPER: Well, it's all --

THE COURT: It's all the --

MR. TEPPER: It's all --

THE COURT: It's all part of the package.

MR. TEPPER: It's all in the same Exhibit A. Yes.

THE COURT: Right.

MR. TEPPER: But one of the -- I see that as standing apart, because the remaining governance enhancements are procedural and have to do with practices, and those will stay in place for six years. A director? You know, who knows how long the director will be there? And adding a new independent director who is coming to this company clean --

THE COURT: What are the terms of the directors? How often do they stand for election? Or what is a director's typical term? And is there any guarantee that this new

director -- I guess by terms of the settlement, the new director has to be around for --

MR. TEPPER:  Well, six years.

THE COURT:  -- minimum of six years, was it?

MR. TEPPER:  Minimum -- well, the enhancements are to be in place for a minimum of six years --

THE COURT:  Okay.

MR. TEPPER:  -- which is longer -- which -- well, first, that's a pretty long time in and of itself.  But it's also substantially longer, in my experience, than most governance reforms that are achieved in stockholder derivative litigation.

THE COURT:  Okay.  Okay.

MR. TEPPER:  In terms of how often directors come up for election, I don't know the answer to that.  I'm going to look at the company's counsel --

THE COURT:  How many directors at the company?

MR. TEPPER:  There are ten directors now.

THE COURT:  Ten.  Okay.

MR. TEPPER:  Yeah.

THE COURT:  Including the new one?

MR. TEPPER:  No.

THE COURT:  Okay.

MR. TEPPER:  So it will be 11.

THE COURT:  Okay.

MR. TEPPER: In terms of the Girsh -- you know, the Girsh factors, I'll point Your Honor to the Shlensky case, which explained that the Girsh factors are factors in class litigation as opposed to derivative litigation. And there are differences between class and derivative actions, although both are representative actions. But in derivative actions, the Girsh factors are applied somewhat less rigorously, is what the Shlensky case said.

And I think that's the case here. You know, the reaction of the class, the settlement -- when we had a robust notice program, there were no objections. The complexity, expense, and likely duration of the litigation -- stockholder derivative litigation by its nature is complex. It likely would have gone on for years. This case has, in fact, gone on for years. It's almost three years old.

The risks of establishing liability, I spoke to that a little bit, starting with the threshold issue of demand futility, which is even before establishing liability. That's whether we are even able to proceed into discovery.

THE COURT: So say you got past that. I mean, here we don't have a settlement fund, obviously, right?

MR. TEPPER: Yes.

THE COURT: So what would have been, in your view, your best outcome at trial?

MR. TEPPER: Well, our best outcome at trial would be

that we find that the board acted in bad faith and breached its fiduciary duties to the company in allowing these statements at issue to be made and the company's SEC filings. We would have established liability.

We have a claim for unjust enrichment, which is the director compensation that was paid to these directors. So we could have potentially recovered that, but that would be nowhere near $55 million.

We would have -- there is a possibility of a monetary recovery. But, again, it's very difficult to quantify that, because the company's damages here are largely non-monetary. I mean, the company has insurance. It suffered reputational damage. Its stock price went down. How much of that is a result of this? How much is a result of other factors?

It would have been very difficult to -- if not impossible, for the Court to order an equitable resolution to the case, by which I mean the company -- it would have been very difficult for the Court to direct the company to add a new director or to direct the company to adopt these governance reforms. So even if we had established liability here, the question of damages would have been very, very challenging. And that, I think, is one of the reasons why so few of these stockholder derivative actions go to trial, simply for that question of damages.

THE COURT: Okay.

MR. TEPPER: Which is not to say that the company was not damaged, because it clearly was damaged here, but it's not damage that can be measured easily in terms of dollars and cents, which is why the company's ability to withstand a greater judgment -- that's one of the Girsh factors -- that's not really relevant here.

The range of reasonableness, if you look at other stockholder derivative settlements which have settled involving comparable wrongdoing -- we attach those decisions to the papers -- governance and non-monetary consideration for a settlement is a way that these cases can be and often are settled. And that, I think, covers all of the Girsh factors.

And when you look at -- in exchange for these governance enhancements and the imposition of a new director, what does the company get for that? They get a very narrow release, which is tailored to derivative claims, arising out of the disclosures at issue in the complaint. So it's not a broad release that gets them off the hook for anything whatsoever. No. The release is only limited to breach of fiduciary claims connected to the specific disclosures that were made by this company in 2021 and 2020. So it's a narrow release, and we believe it's an excellent result for AdaptHealth in exchange for a very tailored release to receive the benefit of these corporate governance reforms and also a new independent director. And we think the factors -- the Girsh factors

strongly favor approval.

And I also want to underscore again that the absence of objections following a very robust notice program shows the stockholders' tacit support for this settlement. I think, in my opinion, in light of the threshold pleading issues, in light of liability, in light of damages, in light of a possible appeal, I think it's unlikely that a better result could have been produced had this case continued to litigate than what we're presenting for Your Honor today.

THE COURT: Are the same folks who would have been able to object to this some, at least, or all of the same folks who received the monetary recovery in the class action?

MR. TEPPER: There is a substantial degree of overlap. Yes.

THE COURT: Right. And wouldn't that then make it more likely for them to care about this one, much less object?

MR. TEPPER: I think that your -- if you are a stockholder -- a stockholder who is the beneficiary of a substantial class action settlement would have been informed about that settlement through the very robust notice program in that action. So they really received notice twice that something was happening with the company, once in terms of the class action and again with the derivative action. So certainly if anybody had an issue with it, they were quite incentivized and aware that this was happening, and they had

every opportunity to make their objections known if they had objections, which they don't.

If Your Honor has no further questions about the settlement, I'd like to proceed to the matter of attorney's fees.

THE COURT: Of course.

MR. TEPPER: For many of the same reasons that we feel the settlement merits approval under the Girsh factors, we feel the Court should also approve a all-in award of attorney's fees and expenses -- so one number, not two numbers -- an all-in fee and expense award of $935,000. Defendants acknowledge that this action caused the company's agreement to appoint a new independent director and adopt the governance reforms and further acknowledge that these are substantial benefits to the company.

This figure, $935,000, was arrived at after contentious negotiations that required Mr. Murphy's intervention, and we believe that the Gunter factors and the lodestar cross-check support the award of the full amount.

Your Honor, we've submitted authority awarding seven-figure attorney's fees for comparable benefits, namely a new director and governance enhancements. And, in fact, there are a number of cases from Delaware, and AdaptHealth is a Delaware corporation, awarding seven figures for a new independent director alone. Tile Shop is one of them. During

the settlement hearing on Tile Shop, Vice Chancellor Glasscock stated that a million dollars was an appropriate fee for a new independent director. And there's other authorities that I'd be happy to submit to the case.

We engaged in good-faith, arm's-length settlement discussions, adversarial negotiations under the auspices of a very well-respected mediator. The action was undertaken on a purely contingency basis. Were we to lose on a motion to dismiss or on summary judgment, plaintiff's counsel would be out of luck. We'd also be out of luck if we were to not prevail at trial, and we accepted those risks knowingly and freely.

And after a robust notice program, no stockholder has come forward to object to the fee application. Counsel on both sides are very well respected. There are some excellent defense firms on Your Honor's left. And both sides were very tenacious. And in my opinion, it resulted in a favorable result for AdaptHealth.

The amount that we're asking for represents a lodestar multiple of 1.8, which is a modest multiplier. And that does not include the time and effort that we have put forward to seek preliminary or final approval of the settlement. So the multiplier, were that time to be counted, would actually be lower. So we think it's a reasonable amount that's supported by the get here, which we also feel is

substantial, and benefit of the company, which the company and the defendants acknowledge.

And finally, Your Honor, I'd like to turn to a service award of -- we're asking for $5,000, which will be paid out of the all-in award of attorney's fees. So it's not going to cost the company or its insurer anything. $5,000. She's held her stock, Ms. Hessler, for five years. She has remained informed about the case. I know that my associate spoke to her regularly, because she would report it to me. She approved of the settlement, and she was involved. And --

THE COURT: She was never deposed, obviously, right?

MR. TEPPER: She was never deposed.

THE COURT: Yeah.

MR. TEPPER: We did not reach that point.

THE COURT: Right.

MR. TEPPER: But had the case proceeded, she likely would have been deposed. And $5,000 is a modest amount of money that's in line with what similar stockholders have been awarded by courts throughout the country.

That's all I have, Your Honor, unless you have any other questions for me.

THE COURT: Those were my questions. You handled them great. Thank you. I --

MR. TEPPER: Thank you, Your Honor. I appreciate that.

THE COURT: I appreciate it. Yeah. Thank you.

Did defense counsel wish to comment at all?

MS. EKONO: Very briefly, Your Honor.

THE COURT: Sure. Sure. Come on up.

MS. EKONO: Good morning, Your Honor.

THE COURT: Good morning.

MS. EKONO: Zeh Ekono on behalf of the AdaptHealth defendants, including the AdaptHealth nominal defendant. The defendants are very pleased to present the settlement to you today. And I don't want to quibble with the things that counsel said that I disagree with, but there are a few things that I think are worth noting for the record.

With respect to the Delaware County matter, which was finally approved by Judge Bartle earlier this year, Your Honor should be aware that the total amount of that settlement was actually $51 million in cash, 1 million shares, and there were governance reforms involved. However, within the release of that settlement agreement, there was an explicit carve-out to make clear that nothing being involved in that securities litigation was intended to have an effect on the derivative litigation in terms of release. And there was an effort to ensure that any of the governance reforms that we agreed to for purposes of the securities litigation were entirely separate from the governance reforms that were agreed to in this action.

THE COURT: How did the governance reforms in this

case go beyond what you agreed to in the class actions?

MS. EKONO: So, Your Honor, if it would be helpful, I could run through a list of what those reforms are. They are substantively different.

So, first and foremost, there was board declassification, which I believe goes to Your Honor's question earlier about the term lengths. Prior to that particular governance reform, board members would sit for staggered terms of three years. With that agreement, with plaintiff's counsel in the Delaware County matter, now everyone sits for a term of one year; and over time, as those staggered terms sort of expire, everyone will ultimately be on the same schedule.

Also, Your Honor, just to note for the record, there are ten members of the current AdaptHealth board, one of which is the independent director that the company agreed to appoint. So that person has already been --

THE COURT: So there were nine. Now there are ten.

MS. EKONO: Exactly.

THE COURT: Okay.

MS. EKONO: So the ten includes the independent director, which was appointed in October of this year.

The other reforms, if Your Honor would like to hear, is there's a reform with respect to executive compensation. Basically, it says that AdaptHealth shall not include any single-trigger accelerated vesting provision with respect to

any sort of termination of employment.

There was a board leadership governance reform, which essentially provides that a lead independent director could be appointed by the board for a one-year term in the event the chairperson was his or herself not an independent director.

There was a reform regarding the voting standard which said that AdaptHealth will maintain a resignation policy requiring any director who receives more withheld votes than for votes to tender their resignation, and the board would determine whether to accept or reject such resignation.

And then, finally, there was a shareholder nomination provision, which essentially provides that -- it was a change in the proxy provision in terms of what would be required to pass various management proxy provisions.  So that's just a brief overview.

THE COURT:  So why are the governance enhancements in this case that much better for the company?

MS. EKONO:  Well, Your Honor, as plaintiff's counsel indicated earlier, the company does and has -- you know, agrees that these governance reforms here confer substantial benefits on the company and its shareholders.  But I do think it's difficult for me to do a sort of comparison between these governance reforms and the other governance reforms.

They were -- while the matters rely on, I think, what defendants view as largely overlapping allegations, they were

entirely separate matters in terms of how they proceeded, and there were a number of issues that ultimately led us to reach the settlement we reached in the securities litigation. And, Your Honor, I was counsel in the securities litigation, so I have some -- I lived through all of that as well.

THE COURT: Okay.

MS. EKONO: Finally, I will just note for the record that this settlement here has no admission of liability. And I just note that because plaintiff's counsel made a number of representations that I think we as defendants might disagree with.

Regardless, we are here today. We are happy with the settlement. We think it confers substantial benefits to the company and its shareholders and that the settlement consideration therein is fair and reasonable. Thank you, Your Honor.

THE COURT: I appreciate your perspective on it.

ME. EKONO: Yes.

THE COURT: Thank you. Thank you for coming here.

Well, look, as I mentioned at the outset, it's all very, very straightforward. We've reviewed everything both preliminarily and now for purposes of the final approval. I had relatively few questions for you. I got them all out.

And, you know, based on a number of things -- obviously, we have all of the legal factors that have been

discussed in the papers. And for me, you know, the most relevant aspects of all of this, the adversarial and very lengthy negotiations that ran seven or eight months, I think, with the mediator, the number of them over that period of time, both for the merits of the case and then separately and afterwards on the fee award, the fact that there is no objection to any of this. Those being, you know, some of the factors that are particularly important to me typically in these cases.

And, you know, this is not a case where I feel I have to write an opinion supporting my final approval of the settlement. I think what we will do, and we will do it quickly for the parties, is take the proposed order and final judgment -- we have some language we typically tweak to put in there just so I feel better about it. Nothing that will change any of the terms of the settlement. And we'll be happy to get to that promptly and get it on the docket for you.

Yeah?

MR. TEPPER: Thank you, Your Honor. I have a hard copy of the agreed-upon order and the final judgment, if the Court would like. I'm happy to --

THE COURT: And we have one, right? Yeah. We've already kind of looked at it and --

MR. TEPPER: Okay.

THE COURT: -- and --

MR. TEPPER: Thank you.

THE COURT: -- made our cosmetic changes, if you will. So, look, it's been a long time for you, right, with both cases.

MS. EKONO: Yes.

THE COURT: So thank you for all your hard work.

MS. EKONO: Thank you, Your Honor.

THE COURT: And certainly thanks to plaintiff's counsel for their hard work and for presenting this to us. We appreciate it. And like I said, we'll get this turned around quickly for you.

All right. Thank you.

IN UNISON: Thank you, Your Honor.

THE COURT: Yeah.

COURTROOM DEPUTY: All rise.

* * * * *

**C E R T I F I C A T I O N**

I, LIESL SPRINGER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Liesl Springer

LIESL SPRINGER, CET-685
J&J COURT TRANSCRIBERS, INC. DATE: November 21, 2024